# 11-5199

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

CHILDREN FIRST FOUNDATION, INC.,

*Plaintiff-Appellee*,

ELIZABETH REX,

*Plaintiff*,

v.

BARBARA J. FIALA,

*Defendant-Appellant*,

RAYMOND P. MARTINEZ, individually, JILL A. DUNN, individually, DAVID A. PATERSON, in his official capacity as Governor of the State of New York, GEORGE E. PATAKI, individually, NEAL SCHOEN, in his official capacity as Deputy Commissioner and Counsel to the New York State Department of Motor Vehicles,

*Defendants*.

On Appeal from the United States District Court
for the Northern District of New York

## BRIEF OF APPELLEE

Jeremy D. Tedesco
Alliance Defense Fund
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

Jeffrey A. Shafer
Alliance Defense Fund
801 G Street NW
Suite 509
Washington, DC 20001
(202) 393-8690

David A. Cortman
Alliance Defense Fund
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774

Counsel for Plaintiff-Appellee
[*Additional counsel listed on following page*]

Kevin H. Theriot
Alliance Defense Fund
15192 Rosewood
Leawood, KS 66224
(913) 685-8000

James P. Trainor
Cutler, Trainor Law Firm
2 Hemphill Place
Suite 153
Malta, NY 12020
(518) 899-9200

## CORPORATE DISCLOSURE STATEMENT

Children First Foundation, Inc. is a New York nonprofit corporation that has no parent corporation and no stockholders.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ..............................................................2

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE.................................................................3

STANDARD OF REVIEW ...................................................................5

STATEMENT OF THE FACTS ...............................................................6

SUMMARY OF THE ARGUMENT .........................................................14

ARGUMENT ...................................................................................17

I.      THE COMMISSIONER'S EXCLUSION OF CFF'S CUSTOM
        PLATE IS BOTH VIEWPOINT DISCRIMINATORY AND
        UNREASONABLE .....................................................................17

        A.      The Commissioner's Exclusion Of CFF'S Custom Plate
                Discriminates Upon The Basis Of Viewpoint....................................17

        B.      The Commissioner's Policies Unconstitutionally Fail
                To Protect Against The Improper Exclusion Of Viewpoints..............24

        C.      The Commissioner's Exclusion Of CFF'S Custom Plate
                Cannot Be Justified As A Content-Based Restriction ........................30

                1.      CFF'S Pro-Adoption Plate Comports With The Purposes Of
                        The Custom Plate Forum ........................................................30

                2.      The Commissioner's Ostensibly Content-Based Restriction
                        On The Custom Plate Forum Cannot Withstand Scrutiny .......34

D.  The Commissioner's Exclusion Of All Abortion-Related
Speech Unlawfully Discriminates On the Basis of Viewpoint ..........41

E.  The Commissioner's Exclusion Of CFF'S Pro-Adoption
Message Is Unreasonable Given The Purpose Of The
Custom Plate Forum ...........................................................................48

II.  CFF'S CUSTOM PLATE IS PRIVATE SPEECH ENTITLED TO THE
FULL PROTECTION OF THE FIRST AMENDMENT ............................50

III.  THE COMMISSIONER VIOLATED CFF'S FIRST AMENDMENT
RIGHTS BY EXCLUDING ITS CUSTOM PLATE FROM A
DESIGNATED OR LIMITED PUBLIC FORUM .....................................55

IV.  THE COMMISSIONER'S CUSTOM PLATE REGULATIONS ARE
IMPERMISSIBLY VAGUE AND CONSTITUTE AN UNCONSTITU-
TIONAL PRIOR RESTRAINT ....................................................................58

V.  THE COMMISSIONER VIOLATED CFF'S RIGHT TO THE EQUAL
PROTECTION OF THE LAWS ...................................................................59

VI.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
ORDERING THE COMMISIONER TO GRANT CFF'S APPLICATION
FOR A CUSTOM PLATE ...........................................................................60

VII  CONCLUSION.............................................................................................62

CERTIFICATE OF COMPLIANCE ...................................................................64

ANTI-VIRUS CERTIFICATE .............................................................................65

CERTIFICATE OF SERVICE .............................................................................66

ADDENDUM ........................................................................................................67

# TABLE OF AUTHORITIES

CASES:

*ACLU of Tenn. v. Bredesen*,
    441 F.3d 370 (6th Cir. 2006) ................................................................ 52-53

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*,
    45 F.3d 1144 (7th Cir. 1995) ........................................................ 34, 37, 47

*Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*,
    508 F.3d 94 (2d Cir. 2007) .............................................19-20, 24-27, 39, 54

*Ariz. Life Coal. Inc. v. Stanton*,
    515 F.3d 956 (9th Cir. 2008) ......... 18, 21, 26-27, 32, 43-45, 47, 49, 53, 56, 61

*Bd. of Educ. of Westside Cmty. Schs. v. Mergens*,
    496 U.S. 226 (1990)...........................................................................50

*Beal v. Stern*,
    184 F.3d 117 (2d Cir. 1999) ........................................................26

*Bessemer Trust Co., N.A. v. Branin*,
    618 F.3d 76 (2d Cir. 2010) ...........................................................5

*Brown v. City of Syracuse*,
    673 F.3d 141 (2d Cir. 2012) ........................................................59

*Byrne v. Rutledge*,
    623 F.3d 46 (2d Cir. 2010) ............................................. 42-43, 48-50, 54-55

*Child Evangelism Fellowship of Md., Inc.* v. *Montgomery Cnty Public Schools*,
    457 F.3d 376 (4th Cir. 2006) ........................................................24

*Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*,
    386 F.3d 514 (3d Cir. 2004) ........................................................19

*Children First Found., Inc. v. Legreide*,
    373 Fed. App'x 156 (3d Cir. 2010) .............................................12

*Children First Found., Inc. v. Martinez*,
    169 F. App'x 637 (2d Cir. 2006) ............................................................ 4, 51

*Children First Found., Inc. v. Martinez*,
    829 F. Supp. 2d 47 (N.D.N.Y. 2011) ......................................... 5, 41, 51, 55

*Choose Life Ill., Inc. v. White*,
    547 F.3d 853 (7th Cir. 2008) ..........................................31, 39-40, 46-47, 53

*Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)...............................................................................37

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994)................................................................................36

*City of Lakewood v. Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988)..........................................................................25-26

*Clark v. Jeter*,
    486 U.S. 456 (1988)...............................................................................59

*Cohen v. California*,
    403 U.S. 15 (1971) ...........................................................................21-23

*Concerned Jewish Youth v. McGuire*,
    621 F.2d 471 (2d Cir. 1980) ...................................................................25

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985)..........................................................................30, 34

*Cox v. Louisiana*,
    379 U.S. 536 (1965)...............................................................................59

*FCC v. Pacifica Found.*,
    438 U.S. 726 (1978)...............................................................................23

*Fighting Finest, Inc. v. Bratton*,
    95 F.3d 224 (2d Cir. 1996) .....................................................................57

*Forsyth Cnty. v. Nationalist Movement,*
 505 U.S. 123 (1992)............................................................ 25, 27

*Fox Television Stations, Inc. v. FCC,*
 613 F.3d 317 (2d Cir. 2010) .............................................58

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1,*
 274 F.3d 464 (7th Cir. 2001) ...........................................22

*Giovanniello v. ALM Media, LLC,*
 660 F.3d 587 (2d Cir. 2011) ...............................................5

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.,*
 100 F.3d 1287 (7th Cir. 1996) ..................................... 30-31, 47

*Hamling v. United States,*
 418 U.S. 87 (1974)...........................................................24

*Hobbs v. Cnty. of Westchester,*
 397 F.3d 133 (2d Cir. 2005) .............................................59

*Hopper v. City of Pasco,*
 241 F.3d 1067 (9th Cir. 2001) .........................................19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston,*
 515 U.S. 557 (1995)..........................................................20

*IMS Heath Inc. v. Sorrell,*
 630 F.3d 263 (2d Cir. 2010) .............................................48

*In re Peters,*
 642 F.3d 381 (2d Cir. 2011) .............................................52

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,*
 505 U.S. 672 (1992)..........................................................56

*Jana-Rock Constr, Inc. v. N.Y. State Dep't of Econ. Dev.,*
 438 F.3d 195 (2d Cir. 2006) .............................................36

*Jenkins v. Georgia,*
  418 U.S. 153 (1974)....................................................................24

*Knox v. Serv. Emps. Int'l Union,*
  No. 10-1121, _ S. Ct. _, 2012 WL 2344461 (June 21, 2012) .......................1

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
  508 U.S. 384 (1993)................................................. 18, 22, 29, 34, 42, 54, 57

*Lewis v. Wilson,*
  253 F.3d 1077 (8th Cir. 2001) .........................................21-23, 27-28, 32, 61

*Linea Area Nacional de Chile S.A. v. Meissner,*
  65 F.3d 1034 (2d Cir. 1995) ...........................................................6

*Lowth v. Town of Cheektowaga,*
  82 F.3d 563 (2d Cir. 1996) ...........................................................52

*Lusk v. Vill. of Cold Spring,*
  475 F.3d 480 (2d Cir. 2007) ................................................. 25, 58, 59

*McCreary v. Stone,*
  739 F.2d 716 (2d Cir. 1984) .........................................................29

*Ognibene v. Parkes,*
  671 F.3d 174 (2d Cir. 2012) ..........................................................5

*OneSimpleLoan v. U.S. Sec'y of Educ.,*
  496 F.3d 197 (2d Cir. 2007) .........................................................53

*Patsy's Italian Rest., Inc. v. Banas,*
  658 F.3d 254 (2d Cir. 2011) ..................................................... 6, 60

*Paulsen v. Cnty. of Nassau,*
  925 F.2d 65 (2d Cir. 1991) ..........................................................19

*Peerless Imps., Inc. v. Wine, Liquor & Distillery Workers Union Local One,*
  903 F.2d 924 (2d Cir. 1990) .........................................................47

*Perry Educ. Ass'n v. Perry Local Educators Ass'n*,
　　460 U.S. 37 (1983)............................................................... 55, 57

*Perry v. McDonald*,
　　280 F.3d 159 (2d Cir. 2001) ............................................... 45, 54

*Planned Parenthood of S.C. v. Rose*,
　　361 F.3d 786 (4th Cir. 2004) ............................................... 52-53

*Pleasant Grove City v. Summum*,
　　555 U.S. 460 (2009)..................................................................54

*Police Dep't of Chicago v. Mosley*,
　　408 U.S. 92 (1972)........................................................... 19, 60

*Pope v. Illinois*,
　　481 U.S. 497 (1987)........................................................... 48-49

*Purkett v. Elem*,
　　514 U.S. 765 (1995)................................................................35

*Ridley v. Mass. Bay Transp. Auth.*,
　　390 F.3d 65 (1st Cir. 2004)............................................... 34, 39-40

*Roach v. Stouffer*,
　　560 F.3d 860 (8th Cir. 2009) ................................... 28, 32, 53, 61

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*,
　　605 F.3d 703 (9th Cir. 2010) ......................................................20

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
　　515 U.S. 819 (1995)........................................17, 30, 42-43, 45-46

*Sammartano v. First Judicial Dist. Ct.*,
　　303 F.3d 959 (9th Cir. 2002) ................................24, 30-31, 33, 47

*Schnabel v. Abramson*,
　　232 F.3d 83 (2d Cir. 2000) ........................................................33

viii

*Snyder v. Phelps*,
    131 S. Ct. 1207 (2011)...................................................................23

*Sons of Confederate Veterans v. Atwater*,
    No. 6:09-CV-134-Orl-28KRS, 2011 WL 1233091 (M.D. Fla. Mar. 30, 2011)
    ...............................................................................................61

*Sons of Confederate Veterans v. Comm'r of Va. Dep't of Motor Vehicles*,
    288 F.3d 610 (4th Cir. 2002) ............................................... 32, 53, 55, 57, 61

*Sons of Confederate Veterans v. Comm'r of Va. Dep't of Motor Vehicles*,
    305 F.3d 241 (4th Cir. 2002) ................................................... 52-53

*Terminiello v. City of Chicago*,
    337 U.S. 1 (1949).................................................................. 20, 22

*Texas v. Johnson*,
    491 U.S. 397 (1989)...................................................................23

*United Food & Commercial Workers Union v. Sw. Reg'l Transit Auth.*,
    163 F.3d 341 (6th Cir. 1998) .....................................................18-19, 45-46

*United States v. Brennan*,
    650 F.3d 65 (2d Cir. 2011) .........................................................60

*United States v. Irving*,
    432 F.3d 401 (2d Cir. 2005) .......................................................48

*United States v. Playboy Entm't Group, Inc.*,
    529 U.S. 803 (2000).................................................................17

*United States v. Stewart*,
    485 F.3d 666 (2d Cir. 2007) .......................................................51

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947).................................................................51

*VIP of Berlin, LLC v. Town of Berlin*,
    593 F.3d 179 (2d Cir. 2010) .......................................................58

ix

*Widmar v. Vincent*,
    454 U.S. 263 (1981)................................................................29

*Women's Emergency Network v. Bush*,
    323 F.3d 937 (11th Cir. 2003) ................................................53

*Women's Res. Network v. Gourley*,
    305 F. Supp. 2d 1145 ...............................................................61

*Wooley v. Maynard*,
    430 U.S. 705 (1977)................................................................50

*Zalaski v. City of Bridgeport Police Department*,
    613 F.3d 336 (2d Cir. 2010) ..............................................56-57

## STATUTES:

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1331 ................................................................................2

28 U.S.C. § 1334 ................................................................................2

42 U.S.C. § 1983 ................................................................................2

42 U.S.C. § 1988 ................................................................................2

## REGULATIONS:

15 N.Y. Comp. Codes R. & Regs. § 16.5 ............................................10

New York Vehicle and Traffic Law § 404 ..........................................29

## OTHER AUTHORITIES:

CFF Press Release, New Jersey Plate Approved, *available at*
    http://www.christiannewswire.com/news/2639715683.html ........................12

Choose Life America, Inc., About Us, *available at* http://www.choose-
    life.org/about-us.php ..........................................................................7

Choose Life America, Inc., State Organizations Information, *available at*
    *http://www.choose-life.org/other-states.php* ....................................................7

Florida Choose Life, Choose Life Story, *available at http://www.flchoose-*
    *life.org/choose-life-story.php* ........................................................................21

Currently Available Custom Plates, *available at*
    *http://www.dmv.ny.gov/cplates.htm* ................................................................7

Plate Shack, New York, AFL-CIO Plate, *available at*
    http://www.plateshack.com/y2k/New_York2/ny-aflcio.jpg ........................38

Plate Shack, New York, Cop Shot Plate, *available at*
    http://www.plateshack.com/y2k/New_York/nycopshot.jpg ........................35

Plate Shack, New York, War on Terror Plate, *available at*
    http://www.plateshack.com/y2k/New_York2/ny-waronterrorvet.jpg...........35

Press Release, Martinez Confirmed, *available at*
    http://www.state.nj.us/mvc/PressReleases/archives/2010/061110.htm ........12

Rob Stein, Washington Post, Changes in Controversial Organ Donation Method
    Stir Fears, *available at* http://www.washingtonpost.com/national/health-
    science/changes-in-controversial-organ-donation-method-stir-
    fears/2011/09/15/gIQAlY9agK_story.html ...................................................36

Steven Greenhouse, New York Times, Union ... Selects a New President,
    *available at* http://www.nytimes.com/2012/06/22/business/union-defensive-
    after-wisconsin-vote-prepares-for-a-new-leader.html?pagewanted=all .......38

**INTRODUCTION**

The Commissioner created a custom plate forum—advertised with the slogan "Take Your Pride for a Ride"—intended for private, nonprofit expression. Practically all comers were welcomed into the forum except CFF because of its pro-adoption views. Every argument the Commissioner has made since is calculated to obscure that simple fact. But in this appeal the mask has cracked. Instead of recycling the arguments the district court rightfully rejected, the Department focuses on a hybrid-speech theory that enshrines the unfettered discretion the Commissioner has claimed all along.

This theory admittedly has no legal support, s*ee* Opening Br. at 43 (admitting that courts evaluating specialty license plate programs have "declined to depart from traditional forum analysis principles"), and clearly demonstrates the lengths to which the Commissioner will go to exclude speech deemed politically inconvenient. *But see Knox v. Serv. Emps. Int'l Union*, No. 10-1121, _ S. Ct. _, 2012 WL 2344461, at *8 (June 21, 2012) (explaining "government may not prohibit the dissemination of ideas that it disfavors"). For "controversy," in and of itself, is not against the Commissioner's tastes, as demonstrated by the Department's issuance of "Cop Shot," "War on Terror," and "Union Yes" plates. The unpopularity of CFF's viewpoint is the true concern. Because this Court has

1

already established that government may not limit access to speech fora to those who advocate popular views, the district court's judgment should be affirmed.

## JURISDICTIONAL STATEMENT

Children First Foundation, Inc. ("CFF") brought suit, pursuant to 42 U.S.C. §§ 1983 and 1988, to vindicate its rights under the First and Fourteenth Amendments to the United States Constitution. The district court exercised federal question jurisdiction under 28 U.S.C. §§ 1331 and 1334 and rendered a final judgment in CFF's favor disposing of all the parties' remaining claims on November 9, 2011. Commissioner Barbara J. Fiala ("the Commissioner") filed a timely notice of appeal on December 7, 2011. This Court has appellate jurisdiction over this matter under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the Commissioner committed unlawful viewpoint discrimination in rejecting CFF's custom plate based on its allegedly offensive and controversial viewpoint.

2.     Whether a departmental regulation prohibiting speech the Commissioner— in her "discretion"—finds "patently offensive" and an alleged departmental practice of disallowing controversial speech are sufficient to prevent the Commissioner from exercising unbridled discretion and engaging in viewpoint discrimination in administrating the custom plate forum.

2

3.      Whether CFF's custom plate constitutes protected private speech in a designated public forum or hybrid private-and-government speech that is completely divorced from forum analysis and outside the scope of the First Amendment.

4.      Whether the Commissioner violated the Due Process Clause by denying CFF's plate application in the unfettered exercise of discretion.

5.      Whether the Commissioner violated the Equal Protection Clause by denying CFF's plate application while approving those of similarly situated nonprofits.

6.      Whether the district court abused its discretion by issuing an injunction requiring the Commissioner to issue CFF's custom plate.

## STATEMENT OF THE CASE

The New York Department of Motor Vehicles (the "Department") permits nonprofit organizations administratively to obtain custom plates supporting their private causes and views.  These plates customarily depict the nonprofit's logo and mission-oriented tagline, are available for purchase either by the general public or the organization's members, and provide funding to the State as well as the nonprofit in question.  To support its efforts promoting adoption, CFF requested a custom plate bearing its logo of two children's smiling faces in front of a yellow sun and its pro-adoption tagline "Choose Life."  The Commissioner rejected CFF's

3

application based on a departmental regulation prohibiting "patently offensive" speech and an alleged departmental practice of excluding controversial expression.

CFF filed suit in the United States District Court for the Northern District of New York, asserting the Commissioner and several other employees of the Department of Motor Vehicles violated its First and Fourteenth Amendment rights. At the motion to dismiss stage, the parties stipulated to the dismissal of various defendants. The district court denied Defendants' motion to dismiss the remaining defendants after concluding they were not entitled to qualified immunity. Defendants appealed to this Court, which held that "custom license plates involve, at minimum, some private speech" and that, "even in a nonpublic forum, restriction on [their content] must be reasonable and viewpoint neutral." *Children First Found., Inc. v. Martinez*, 169 F. App'x 637, 639 (2d Cir. 2006) (unpublished). Because the facts stated in CFF's complaint did not "support[] the defense of qualified immunity," this Court determined that it lacked appellate jurisdiction. *Id.*

On remand, the parties stipulated to the dismissal of all defendants except Raymond Martinez, the Commissioner who denied CFF's custom plate application—in his individual capacity—and Barbara Fiala, the current Commissioner of the Department of Motor Vehicles—in her official capacity. The parties subsequently filed competing motions for summary judgment. The district court granted Defendant Martinez's motion on the basis of qualified immunity,

4

*Children First Found., Inc. v. Martinez*, 829 F. Supp. 2d 47, 66 (N.D.N.Y. 2011), but granted CFF's motion as to Defendant Fiala on three separate grounds.[1]

First, the district court concluded that the Commissioner's alleged "exclusion of the entire subject of abortion from the forum is not permissible content-based discrimination but is discrimination based on viewpoint, which runs afoul of the First Amendment." *Id.* at 62. Second, the district court held that the "denial of CFF's plate application was unreasonable" based on "the purpose of New York's custom plate forum," which is to disseminate a variety of private views. *Id.* at 63. Third, the district court determined that the Department's regulations and practice granted the Commissioner "unbridled discretion" to approve or deny applications for custom plates. *Id.* at 64.

## STANDARD OF REVIEW

On a motion for summary judgment, this Court reviews de novo questions of law and mixed questions of law and fact, but reviews only for clear error the district court's factual findings. *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010). Summary judgment is appropriate if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012). Here, the parties agree that

---

[1] This Court may affirm the district court's judgment on any basis supported by the record and is not confined to the district court's reasoning below. *See*, *e.g.*, *Giovaniello v. ALM Media, LLC*, 660 F.3d 587, 591 (2d Cir. 2011).

"the issues are purely legal" and that "summary judgment is appropriate." *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1039 (2d Cir. 1995).

When it comes to the scope of injunctive relief, this Court reviews the district court's ruling only for "an abuse of discretion." *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011).

## STATEMENT OF THE FACTS[2]

CFF is a New York nonprofit corporation that promotes adoption as a positive choice for women with unwanted pregnancies or newborns in New York, New Jersey, and Connecticut by donating funds and raising awareness. Joint Appendix ("JA") 190, 557. Charles and Elizabeth Rex founded CFF after personally adopting a son and a daughter born to young women with unwanted pregnancies who chose life for their children. JA184. The funds CFF raises are used to support healthcare facilities that serve pregnant women, receive no government funding, and do not perform or refer for abortions. JA563.

In December 2001, CFF applied to the Department for a custom plate bearing its logo, a simulated crayon drawing of two children's smiling faces in front of a yellow sun, and its tagline, "Choose Life." JA171-202. Twenty-eight states have approved custom plates bearing the phrase "Choose Life." *See* Choose

---

[2] Due to length limitations, CFF's factual summary is necessarily abridged. A full account of CFF's dealing with the Department is available on pages 149 to 169 of the Joint Appendix.

Life America, Inc., State Organizations Information, *available at* http://www.choose-life.org/other-states.php (last visited June 25, 2012). Of these plates, twenty-one also bear substantially the same logo adopted by CFF, which Choose Life America, Inc. licenses to state organizations that support adoption through the sale of "Choose Life" plates.[3] *See id.*; *see also* JA 175.

New York's custom plate program was initiated in 1992 to increase State revenue and was advertised with the slogan "Take Your Pride for a Ride."[4] JA211, 1054-55. In ensuing years, the Department approved at least 259 custom plates in eight wide-ranging categories: (1) Sports Teams; (2) Causes; (3) Organizations; (4) Counties and Regions of New York; (5) Colleges, Fraternities, and Sororities; (6) Military and Veterans, (7) Emergency Services, and (8) Professions.[5] JA219, 372. By creating all-encompassing categories like "Causes" and "Organizations" the Commissioner opened the forum for thousands of different groups to discuss a virtually unlimited number of topics. The Commissioner has approved many plates in these two categories that bear logos and mission-oriented taglines supporting a wide spectrum of views. *See, e.g.*, JA251-54, 257-63.

---

[3] *See also* Choose Life America, Inc., About Us, *available at* http://www.choose-life.org/about-us.php (last visited June 25, 2012).

[4] New York law does not specifically provide for custom plates. Commissioners have authorized them under New York Vehicle and Traffic Law § 404(1), which allows the Commissioner to "issue special number plates to applicants … in the same manner as other number plates are issued."

[5] Images of the custom plates the Commissioner currently makes available are accessible at http://www.dmv.ny.gov/cplates.htm.

7

A small sampling of plates welcomed into the forum illustrates the diversity of perspectives represented therein.  *See* JA244, 251-54, 257-63, 275, 280.

- State of the Arts
- Ancient Order of Hibernians
- Combat Infantrymen
- National Multiple Sclerosis Society
- Keep Kids Drug Free
- Conserve Habitat
- Uniformed Firefighter
- Agriculture in the Classroom
- Union Yes
- Drive Out Diabetes
- Knights of Columbus
- Autism Society of America
- New York Giants
- Land Surveyors
- Porsche Club of America
- American Motorcyclist Association
- Martin Luther King
- Peace at Home
- Drive for the Cure
- Olympic Spirit
- Erie Canal
- Copshot
- Penn State
- Life… Pass It On

The Commissioner has thus approved custom plates supporting a wide variety of educational, artistic, social, environmental, and healthcare-related causes.  New York residents may support agricultural education or cultural institutions, social causes like domestic violence awareness, or the preservation of wildlife.  *See, e.g.*, JA251, 252, 254.  But most "Cause" plates are dedicated to healthcare-related issues, ranging from diabetes and cancer research, to organ donation, and the prevention of substance abuse among young people.  JA252-53.

"Organizational" plates promote an equally wide range of recreational, occupational, associational, political, and social interests.  New Yorkers may advertise their passion for motorcycles and Porsches, proclaim their professional bonds as firemen, soldiers, or land surveyors, and tout their cultural and

8

philosophical ties as Hibernians and Knights of Columbus. JA258-59, 260-62, 283-84. Some political and social movements are also represented, including unions and advocates of social justice. JA260, 263.

To apply for its own custom plate, CFF was required to submit a group information form, artwork in accordance with a plate design template, and a draft marketing plan for its proposed plate. The design template designated a smaller portion of space on the left side of the plate for a "logo" and a larger segment of space along the bottom of the plate for a "tag-line." JA216-17. Once CFF submitted these materials, the Department indicated that it would contact CFF "to discuss the next steps and an approximate timetable for the implementation of [its] custom license plate." JA210. But CFF received no such communication.

Approximately two months after CFF submitted its completed application, the Commissioner issued a denial allegedly based on the Department's 1998 rejection of a different "Choose Life" custom plate. JA 401. The Commissioner's denial letter gave CFF no explanation of the reasoning behind this decision, nor did it include a copy of the Department's 1998 ruling.[6] JA298. CFF's counsel subsequently contacted the Commissioner on several occasions in an effort to discover his reasoning, clarify the relevant legal principles, and resolve the matter without the need for a lawsuit. JA297-98, 301.

---

[6] CFF was only able to obtain a copy of the Departments 1998 denial letter by submitting a public records request. JA449; *see also* JA406.

9

In June 2002, CFF's counsel received a response from Jill Dunn who served as the Department's Deputy Commissioner and Counsel. JA408. Dunn explained that although "the Commissioner is not required to issue any special plates," his discretion is guided by a Department regulation stating that "'no plate shall be issued … which is, in the discretion of the commissioner, obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive.'" JA408 (quoting 15 N.Y. Comp. Codes R. & Regs. § 16.5(e)). Because the Commissioner believed "a significant segment of the population" would find CFF's speech "patently offensive," he denied CFF's application for a custom plate. JA409.

Dunn also alleged a practice of "insuring that plates issued by the State do not present or support either side of [the abortion] issue, or any other political, religious or social issue that has proven to be so contentious and divisive" in support of the Commissioner's decision. JA409. She alleged that this unwritten practice was based on a concern that public hostility to CFF's speech would "engender violent discourse among drivers." *Id.* Over 250 approved custom plates publicized viewpoints on political, religious, cultural, and social topics, but the Commissioner concluded that only CFF's pro-adoption viewpoint was so "emotionally charged" as to elicit "road rage and aggressive driving." JA409. Dunn offered that if CFF reworked its design to emphasize its adoption-related

10

"mission" in a way that was "unrelated to the controversial issues" the "Choose Life" message implicated, the Commissioner would "give that application all due consideration." JA410.

In October 2003, CFF responded to the Commissioner's offer to consider a revised plate that emphasized its adoption-related mission.[7] JA308. It submitted a redesign that moved its tagline "Choose Life" underneath the logo in a smaller font and placed the internet address "FUND-ADOPTION.ORG" in the prominent, tagline position at the bottom of the plate. JA314. CFF presented this plate as "an acceptable compromise" formulated to address the Commissioner's concerns. JA309. CFF also provided the Commissioner with information related to Connecticut's recently approved "Choose Life" plate, which featured the same components as CFF's modified submission. *Id.*

In March 2004, the Commissioner rejected CFF's redesigned plate for the reasons stated in Dunn's June 2002 correspondence because CFF's "subsequent submission [did] not address the fundamental points raised" therein. JA438. The Commissioner concluded that by maintaining its "Choose Life" tagline CFF demonstrated its "inten[t] to draw attention to…. the abortion debate." *Id.*

---

[7] CFF's position has always been that "'Choose Life' and 'Choose Adoption' are … related phrases because it is impossible to choose adoption without choosing life." JA309. But the Commissioner maintains, without support in the record, "that the phrase 'Choose Life' is more commonly associated with the abortion rights debate than it is with the promotion and funding of adoption." JA409.

11

Because such a message would "incite the type of anger and outrage … seen outside abortion clinics," the Commissioner refused to "voluntarily" approve CFF's requested custom plate.[8] *Id.*

The Commissioner supported this assessment by referencing the breadth of his discretion "over the design, marketing and issuance of any custom plate series," matters the Commissioner described as "solely within [his] discretion, unless otherwise directed by State law." JA439. Indeed, the Commissioner viewed his discretion as so broad that he could decline to "issue or develop a special plate at the request of any individual or organization." *Id.* He based this assertion on the lack of a "legal requirement" under New York law that the Commissioner issue any particular specialty plate. *Id.*; *see infra* p. 28-29.

CFF contacted the Department a third time in June 2004 to offer a second alternative design that it believed would meet the Commissioner's concerns. This redesign moved the internet address "SafeHavens-Adoption.org" into the prominent tagline position of CFF's plate, while shifting its actual tagline "Choose Life" beneath CFF's smiling-children logo. JA460-61. By emphasizing CFF's

---

[8] Notably, former Commissioner Martinez became the chair of New Jersey's Motor Vehicle Commission in June 2010. *See* Press Release, Martinez Confirmed, *available at* http://www.state.nj.us/mvc/PressReleases/archives/2010/061110.htm (last visited June 25, 2012). He approved CFF's New Jersey "Choose Life" plate in November of that year. *See* CFF Press Release, New Jersey Plate Approved, *available at* http://www.christiannewswire.com/news/2639715683.html (last visited June 25, 2012); *Children First Found., Inc. v. Legreide*, 373 Fed. App'x 156, 159-60 (3d Cir. 2010) (unpublished) (reversing grant of qualified immunity).

12

support of the State of New York's official Safe Haven program, enshrined in the Abandoned Infant Protection Act of 2000, this design clearly accorded with official state policy. And because "everyone wants desperate women to 'choose life'" when it comes to "unwanted newborns," CFF noted that "[n]o one could possibly be offended by this plate design." JA460.

Elizabeth Rex discussed CFF's second alternative design with Dunn over the telephone in July 2004 and ended the conversation with the impression that CFF's second redesign would be approved. JA48, 50. But approximately one week later Elizabeth Rex received a letter from Dunn informing her that the Commissioner had "suspended the custom plate program until such time as the criteria and standards for considering applications for the creation of new special plate series, other than those mandated by law, have been fully reviewed and updated through the formal regulatory process." JA55.

Dunn characterized CFF's custom plate application as having been "denied more than two years ago" and further stated that "the original decision of the Department remains unchanged and there is no application currently pending which is ripe for consideration." *Id.* She assured CFF that it would "have the opportunity to submit a new application with any updated information once the custom plate program is reinstated." *Id.* Eight years later, the Department has not issued any new regulations to govern the custom plate program and the

13

Commissioner's moratorium on new applications still stands. Opening Br. 10. The Commissioner nonetheless continues to issue 238 custom plates approved before August 2004, thereby generating revenue for nonprofit organizations and the State.[9] JA219-94, 476.

## SUMMARY OF THE ARGUMENT

By uniquely excluding CFF's pro-adoption message from a forum composed of 238 plates sponsored by nonprofit organizations, the Commissioner discriminated on the basis of viewpoint. Indeed, the very nature of the Commissioner's alleged regulations against "offensive" and "controversial" speech demonstrate that the Department prohibited CFF from accessing the forum because it ostensibly held an unpopular, minority view. But speech is protected by the First Amendment precisely because some might find it troubling or offensive. Government is consequently barred from prohibiting speech unless it presents a clear and present danger to the public far more serious than public inconvenience, annoyance, or unrest. The Commissioner cannot make this showing because vehicles with "Choose Life" plates have traveled through New York and elsewhere for twelve years without any sign of potential violence.

The First Amendment requires government to proactively guard against the improper exclusion of viewpoints. Far from establishing objective standards for

---

[9] Before the moratorium and filing of this lawsuit, the Commissioner made 21 additional custom plates available for purchase. *See* JA372.

entry into the custom plate forum, the Department's regulations are nothing more than vague, subjective criteria that encourage the Commissioner to exclude speech that is not politically expedient. This unfettered discretion is emphasized by the Department's unerring assertion that the Commissioner is not required to issue any particular custom plate. Every ruling on a custom application accordingly poses an impermissible risk that the Commissioner will issue a denial based solely on speakers' views.

The Commissioner cannot justify his rejection of CFF's application as a content-based restriction on abortion-related speech. Abortion is not addressed in the Department's written regulation and is not a relevant "subject" for purposes of defining the custom plate forum, but merely a subcategory of those speaking on social, moral, and healthcare-related topics.

That this more general level of analysis is appropriate is demonstrated by the Commissioner's willingness to accept almost any message, except CFF's "Choose Life" speech. Indeed, the Commissioner cites no other type of "controversial" denial. Discrimination against an entire class of viewpoints is just as unconstitutional as the exclusion of only one. The Commissioner's focus on CFF's viewpoint is further confirmed by the Commissioner's selective application of the purported ban on controversial speech and misconstruction of CFF's message in

15

order to characterize it as "patently offensive" and "controversial" in the first place.

The Commissioner's ban on CFF's speech is also unreasonable because it serves no legitimate interest. "Patently offensive" speech is only proscribable to the extent it is "obscene" and obscenity requires an objective analysis that is not present here. In the same vein, the Commissioner's alleged ban on controversial expression is unreasonable because it has been inconsistently applied.

The Department's theory of mixed government-private speech cannot retroactively justify the Commissioner's unconstitutional actions because it is precluded on multiple grounds, not least of which are the Commissioner's waiver of this argument below and this Court's prior opinion in this case. But even if this Court were to reach this issue, the Commissioner fails to recognize that forum analysis is specifically designed to account for instances in which private expression occurs within a government-run program. No court has ever held that the "hybrid" nature of speech allows a program administrator to discriminate among viewpoints.

Under the Fourteenth Amendment, the Commissioner's regulations are also invalid because they fail to incorporate any objective criteria and consequently are void for vagueness and operate as an unconstitutional prior restraint. Equal protection principles further preclude the Commissioner from granting other

16

nonprofits access to the custom plate forum, while denying CFF admittance because of its viewpoint.

The district court accordingly did not abuse its discretion in remedying this constitutional infraction in the only possible way, *i.e.*, by ordering the Commissioner to issue CFF's custom plate.

## ARGUMENT

## I. THE COMMISSIONER'S EXCLUSION OF CFF'S CUSTOM PLATE IS BOTH VIEWPOINT DISCRIMINATORY AND UNREASONABLE.

"Discrimination against speech because of its message" is presumptively unconstitutional. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Government accordingly bears the burden of justifying any restrictions placed on private speech. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000). Because CFF's exclusion from the custom plate forum was based solely on its "controversial" viewpoint, the Commissioner clearly fails to hurdle this bar.

### A. The Commissioner's Exclusion of CFF's Custom Plate Discriminates Upon the Basis of Viewpoint.

Speech otherwise within a speech forum's limitations may not be excluded based on its viewpoint. *Rosenberger*, 515 U.S. at 830. This remains true regardless of the specific nature of the forum. As the Supreme Court has explained, government cannot "regulate speech in ways that favor some viewpoints

17

or ideas at the expense of others." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993).

In this case, the Commissioner rejected CFF's custom plate based on the unexplained analysis of a previous Commissioner. JA401. That reasoning, which CFF only discovered through a public records request, JA449, hinged on an asserted "policy not to promote or display" controversial messages, JA406, which was unwritten, rarely—if ever—applied, and nonbinding, as the Commissioner "decided to adhere to" it. Opening Br. at 11; JA401. When this arbitrary determination was questioned, the Commissioner stated that he banned CFF's speech under a regulation that proscribed "patently offensive" expression. JA408-09. On appeal, the Commissioner's only reason for excluding CFF's speech is its "politically charged and controversial" message. Opening Br. at 3.

Bans placed on "controversial" expression "unquestionably allow[]" for "viewpoint discrimination." *United Food & Commercial Workers Union v. Sw. Reg'l Transit Auth.*, 163 F.3d 341, 361 (6th Cir. 1998); *see also Ariz. Life Coal. Inc. v. Stanton*, 515 F.3d 956, 972 (9th Cir. 2008) (recognizing that a ban on controversial expression "may all too easily [result in] viewpoint discrimination" (quotation omitted)). Controversies, by their very nature, surround expression that challenges "the beliefs of a significant segment of the public." *United Food*, 163 F.3d at 362. As this Court has explained, disputes concerning unpopular opinions

18

are consequently "inseparable" from an advocate's "viewpoint," *id.*, as they reflect "an aggregation of the [public's] agreement with or valuation of the message" a speaker "wishes to convey." *Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 101-02 (2d Cir. 2007) (holding that conditioning a student group's access to a university's student-fee forum on a student referendum gauging its popularity constituted viewpoint discrimination).

Phrased differently, unless "some take issue" with an advocate's point of view no controversy is possible. *Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004) (Alito, J.). Banning "controversial" expression therefore serves only to silence views that conflict "with prevailing community standards." *United Food*, 163 F.3d at 361. Viewpoint discrimination thus lies at the very heart of any prohibition of "controversial" speech. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1079 n.12 (9th Cir. 2001) ("By definition, that which is 'controversial' is a cause of disagreement, or subject to opposing views." (quotation omitted)).

This is why the Supreme Court has barred government from granting "the use of a forum to people whose views it finds acceptable, but deny[ing] use to those wishing to express less favored or more controversial views." [10] *Police*

---

[10] *See also Paulsen v. Cnty. of Nassau*, 925 F.2d 65, 71 (2d Cir. 1991) ("[A] listener's reaction to speech does not control the permissible scope of First Amendment activity.").

*Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). For "it is axiomatic that the government may not silence speech because the ideas it promotes are thought to be offensive."[11] *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). One of the very purposes of the First Amendment's Free Speech Clause is to "invite dispute." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).

Accordingly, as this Court has explained, "[f]avoritism of majority views is not an acceptable principle for allocating" access to a speech forum. *Amidon*, 508 F.3d at 102. By focusing on the popularity of a nonprofit's message, the Commissioner creates—at the very least—"a substantial risk" that access to the custom plate forum "will be discriminatorily skewed in favor of" groups that adopt "majoritarian views." *Id.* But government is prohibited from placing "minority views at the mercy of the majority." *Id.* (quotation omitted). The Commissioner's process for approving custom plates is therefore impermissibly viewpoint-based. *See id.* at 101-02.

Government censorship of minority viewpoints is only permitted when speech is "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello*, 337 U.S. at 4. The Commissioner's alleged fears of "road rage" resulting from CFF's

---

[11] *See also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 579 (1995) (recognizing that the Free Speech Clause "has no more certain antithesis" than the leveraging of "speech restriction[s] … to produce thoughts and statements acceptable to some groups or, indeed, all people").

"Choose Life" slogan fall far from the mark. *See Lewis v. Wilson*, 253 F.3d 1077, 1081-82 (8th Cir. 2001) (rejecting a similar argument in the context of a special plate). At the outset, any violent reaction to CFF's custom plate would "result directly from [its] message." *Id.* at 1081. It is therefore impossible for the Commissioner to convincingly characterize the denial of CFF's custom plate application as a content-based exclusion. *See id.*; *Ariz. Life Coal.*, 515 F.3d at 972 ("Preventing Life coalition from expressing its viewpoint out of a fear that other groups would express opposing views seems to be a clear form of viewpoint discrimination.").

The Commissioner also cites no evidence "that substantial numbers of citizens are standing ready to strike out physically at" CFF's pro-adoption speech. *Cohen v. California*, 403 U.S. 15, 23 (1971). "Choose Life" plates have been on sale throughout the nation for twelve years[12] and drivers from New Jersey, Connecticut, and other states regularly display this message while driving through New York with no ill effects. JA450. Any concerns regarding "road rage" are accordingly baseless, particularly as the Commissioner fails to cite a single instance in which the "Choose Life" message on either a bumper sticker or license plate has resulted in an episode of vehicular violence. *See Cohen*, 403 U.S. at 26

---

[12] *See* Florida Choose Life, Choose Life Story, *available at* http://www.flchoose-life.org/choose-life-story.php (explaining that Florida was the first state to offer a Choose Life plate and that its plates became available in 2000).

(requiring a "particularized and compelling reason" for the regulation of "offensive" speech). Indeed, Former Commissioner Martinez testified that he was unaware of any violent responses to the "Choose Life" message or that of any custom plate in New York or elsewhere. JA1159. And the Department previously issued special vanity plates with a "Choose Life" message, which CFF's members openly utilized in New York with no apparent ill effects. *See* JA449-52, 455-57.

Restricting CFF's essential right to advocate its views requires the Commissioner to present more than "the mere possibility of a violent reaction" to its speech. *Lewis*, 253 F.3d at 1081; *see Lamb's Chapel*, 508 U.S. at 395-96 (rejecting a school district's assertion that allowing a church to use its property for "proselytizing … would lead to threats of public unrest and even violence" when there was "nothing in the record to support such a justification"); *Terminiello*, 337 U.S. at 3 (protecting private expression even when a crowd was "angry and turbulent" and police were unable "to prevent several disturbances"). "[A]n undifferentiated fear or apprehension of disturbance … is not enough to overcome the right to freedom of expression." *Cohen*, 403 U.S. at 23 (quotation omitted). Indeed, preventing the government from suppressing speech based on the "angry reaction that it may generate is precisely what" the Supreme Court's "'heckler's veto' cases" are all about. *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 467 (7th Cir. 2001).

22

These precedents clearly reject the "self-defeating proposition" that States may seek "to avoid physical censorship of one who has not sought to provoke such a response by a hypothetical coterie of the violent and lawless" by "effectuat[ing] that censorship themselves." *Lewis*, 253 F.3d at 1082 (quoting *Cohen*, 403 U.S. at 23). That a speaker's viewpoint "gives offense" is a reason "for according it constitutional protection," not shutting it out. *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978). Government is categorically barred from prohibiting "the expression of an idea simply because society finds [it] offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Outside of a few narrowly-defined circumstances, the First Amendment simply prohibits government from declaring speech "sufficiently offensive to require protection for the unwilling listener or viewer." *Snyder v. Phelps*, 131 S. Ct. 1207, 1220 (2011) (quotation omitted). The remedy for those who disagree with CFF's viewpoint is not physical intimidation but simply to avert their eyes from its custom plate. *Id.* And this should not be a difficult prospect, as license plates measure a mere 6 by 12 inches.[13]

---

[13] Contrary to the Commissioner's assertions, custom plates have ample expressive value, which does not depend on length. The First Amendment protects haikus no less than sonnets.

The Commissioner's concerns are thus "motivated by the nature of [CFF's] message rather than the limitations of the forum." *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 971 (9th Cir. 2002). This is viewpoint discrimination. *Id.*

### B. The Commissioner's Policies Unconstitutionally Fail to Protect Against the Improper Exclusion of Viewpoints.

Rather than honoring CFF's free speech rights, the Commissioner labeled CFF's "Choose Life" plate "patently offensive"—a term reserved for obscene sexual conduct—and disapproved its use.[14] Any offense taken to CFF's pro-adoption speech is clearly not comparable to that reserved for "hard core sexual conduct." *Hamling v. United States*, 418 U.S. 87, 113 (1974). This calls into question whether the Department's regulations sufficiently protect against viewpoint discrimination or whether they "inject[] a substantial risk of undetectable viewpoint discrimination into the" custom-plate approval process. *Amidon*, 508 F.3d at 103; *see also Child Evangelism Fellowship of Md., Inc.* v. *Montgomery Cnty Public Schools*, 457 F.3d 376, 385 (4th Cir. 2006) (inquiring whether a "policy regulating access to" a speech "forum protect[ed] against viewpoint discrimination").

"[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to

---

[14] *See, e.g.*, *Jenkins v. Georgia*, 418 U.S. 153, 160 (1974) (recognizing that proscriptions on "obscene materials" are limited to "patently offensive 'hard core' sexual conduct" (quotation omitted)).

*protect* against the improper exclusion of viewpoints." *CEF of Md.*, 457 F.3d at

384; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760

(1988) ("[T]he Constitution requires that the [Department] establish neutral criteria

to insure that the licensing decision is not based on the … viewpoint of the speech

being considered.").   Accordingly, this Court has not hesitated to invalidate forum

limitations that result in a "substantial risk" that access "will be discriminatorily

skewed in favor of" those with "majoritarian views." *Amidon*, 508 F.3d at 102.

For rules "requiring prior administrative approval of speech" bear "a heavy

presumption against their constitutional validity." *Lusk v. Vill. of Cold Spring*, 475

F.3d 480, 485 (2d Cir. 2007) (quotation and alteration omitted) (invalidating the

application of a sign ordinance that heavily burdened a unique and important

means of communication).

Any regulation that requires the pre-approval of speech "must, as a

prophylactic matter, contain 'narrow, objective, and definite standards to guide'"

officials' exercise of authority. *Amidon*, 508 F.3d at 103 (quoting *Forsyth Cnty. v.

Nationalist Movement*, 505 U.S. 123, 131 (1992)).   This ensures that the First

Amendment rights of private parties are not "abridged at the unbridled will or

broad discretion of government officials." *Concerned Jewish Youth v. McGuire*,

621 F.2d 471, 479 (2d Cir. 1980).   Meaningful "standards" confining an

administrator's authority are thus a prerequisite to the survival of any such restriction on speech. *City of Lakewood*, 486 U.S. at 763.

Preset criteria do not alone "ensure that an official's discretion is adequately 'bridled.'" *Amidon*, 508 F.3d at 104; *see also Beal v. Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999) (explaining that "[t]he existence of standards does not in itself preclude a finding of unbridled discretion, for the existence of discretion may turn on the looseness of the standards or the existence of a condition that effectively renders the standards meaningless"). In this case, the Commissioner's regulation excluding speech deemed "patently offensive" and alleged practice of banning controversial speech are simply "too vague and pliable to effectively" ensure "viewpoint neutrality." *Amidon*, 508 F.3d at 104; *see also Ariz. Life Coal.*, 515 F.3d at 972 (recognizing that "[a] ban on 'controversial speech' may all too easily lend itself to viewpoint discrimination" (quotation and alteration omitted)).

This conclusion is unavoidable when one considers the numerous unrestricted judgments involved in speculating that speech is likely to cause "road rage." First, the Commissioner must decipher how a given message is likely to be interpreted by the general public. Second, the Commissioner must estimate whether that viewpoint is disputed by a significant number of people. Third, if so, the Commissioner must conjecture whether that difference of opinion is sufficiently vehement to result in violence. And the Commissioner makes all of

26

these judgments without reference to any "objective criteria," a necessary limitation of speech "[r]estrictions based on community standards of decency." *Ariz. Life Coal.*, 515 F.3d at 972; *see Amidon*, 508 F.3d at 105 (requiring that forum restrictions be "based upon neutral, objective criteria").

The Commissioner's custom plate approval scheme clearly "involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority." *Forsyth Cnty.*, 505 U.S. at 131 (quotation omitted). Indeed, the "patently offensive" speech regulation and controversial-speech exclusion are nothing more than "nebulous and malleable" criteria that may be easily applied by a "public official with even marginal creative ability" to exclude speech that is not "presently politically expedient." *Lewis*, 253 F.3d at 1080-81 (quotations omitted). In these circumstances, "the danger of censorship and of abridgment of … precious First Amendment freedoms is too great to be permitted." *Forsyth Cnty.*, 505 U.S. at 131 (quotation omitted). Absolutely "nothing in the ordinance … prevent[s]" the Commissioner from excluding a nonprofit's plate based on its viewpoint. *Lewis*, 253 F.3d at 1080.

Every application of the Commissioner's discretion thus poses an "impermissible risk" that requests for custom plates will be rejected based solely on speakers' disfavored views. *Id.* (quotation omitted). The Commissioner, for example, determined that no other viewpoint expressed in the custom-plate forum

27

touched upon an "issue" as "emotionally charged" as CFF's pro-adoption speech, despite the fact that other custom plates adopt more contentious views related to sports rivalries, biker groups, the War on Terror, and union rights. JA409; *see, e.g.*, JA241, 258, 284, 367. Such opinion-based assessments, made without reference to any pertinent facts or objective criteria, clearly enable the Commissioner to engage in viewpoint discrimination. This is sufficient, in and of itself, to render the Commissioner's exclusion of CFF's custom plate unconstitutional, as other circuits have previously concluded under factually indistinguishable circumstances. *Lewis*, 253 F.3d at 1080; *see also Roach v. Stouffer*, 560 F.3d 860, 869-70 (8th Cir. 2009) (explaining that government's actual reasoning is irrelevant).

The Department's sweeping interpretation of the Commissioner's discretion in approving custom plate applications drives this point home. State officials persistently told CFF that state law did not require the Commissioner to exercise his discretion, on an evenhanded basis, to grant its application for a custom plate. *See, e.g.*, JA408 ("[T]he Commissioner is not required to issue any special plates."); JA439 ("[T]here is no legal requirement that the Department issue or develop a special plate at the request of any individual or organization."). And the Commissioner, rather surprisingly, maintains this claim on appeal. Opening Brief at 8 ("The Commissioner is not required to … issue any particular plate ….").

28

Such transparent claims to unbounded discretion reflect a fundamental misapprehension of governing law.

It is true that New York law states that "[t]he commissioner may issue special number plates" but that nothing in the authorizing statute shall "be construed to require the commissioner to issue a special number plate or plates." N.Y. Vehicle & Traffic Law § 404(1) & (4). This language stands for the unremarkable proposition that the Commissioner is not required to establish a custom plate forum. *Cf. Lamb's Chapel*, 508 U.S. at 391 (discussing "N.Y. Educ. Law § 414"). But once that forum is opened the Commissioner is required to operate it in accordance with "applicable constitutional norms." *Widmar v. Vincent*, 454 U.S. 263, 267 (1981); *see also Lamb's Chapel*, 508 U.S. at 391-92. As this Court has explained, "[t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *McCreary v. Stone*, 739 F.2d 716, 723 (2d Cir. 1984) (quotation omitted). The Commissioner's failure to appreciate this essential requirement of the First Amendment invariably led to his unfettered exercise of discretion in rejecting CFF's custom plate.

### C. The Commissioner's Exclusion Of CFF's Custom Plate Cannot Be Justified As A Content-Based Restriction.

#### 1. CFF's Pro-Adoption Plate Comports With The Purposes Of The Custom Plate Forum.

Content-based exclusions of speech are occasionally permitted for one reason only—to preserve government property "for the use to which it is dedicated." *Rosenberger*, 515 U.S. at 829 (quotation omitted). Whether a restriction on speech is truly content-based thus depends on whether that limitation is designed to remedy "a true incompatibility between the [proscribed] activity and the forum."[15] *Sammartano*, 303 F.3d at 971 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 806 (1985)).

Courts must "scrutinize carefully any [alleged] content-based discrimination" to ensure that government does not employ it as "[a] façade for viewpoint discrimination," thereby "shutting out some viewpoints by labeling them as subjects."[16] *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1298 (7th Cir. 1996). The most common method of achieving this sleight of hand is to characterize a speech restriction as operating "at a higher (and more

---

[15] *Rosenberger*, 515 U.S. at 829 (emphasizing that it is "[t]he necessities of confining a forum to the limited and legitimate purposes for which it was created" that "justif[ies] the State in reserving it for certain groups or for the discussion of certain topics").

[16] *See also Grossbaum*, 100 F.3d at 1298 (recognizing the temptation for government to classify "a particular viewpoint as a subject rather than as a viewpoint *on a subject*" because this action may serve to "justify discrimination against the viewpoint").

appropriate) level of generality than it actually does." *Sammartano*, 303 F.3d at 971. Proscribing expression "at a sufficiently high level of generality" ensures the government is acting based on speech's content. *Grossbaum*, 100 F.3d at 1299. But narrow speech bans, such as the Commissioner's alleged ban on speech related to abortion,[17] raise the question of whether a genre of expression is not "itself a subcategory of a larger subject-matter category—those who wish to [sponsor plates] indicating an affiliation with some organization or point of view." *Sammartano*, 303 F.3d at 971.

In this case, the more general "subject-matter category" of "those who wish to [sponsor plates] indicating an affiliation with some organization or point of view" clearly presents "the appropriate level" of analysis. *Id.* The 238 plates in the custom plate forum do not share a common subject matter. Nor do they address a limited realm of issues. They simply reflect the varied beliefs and interests of nonprofits participating in the forum; from the ideals of Masons, sacrifice of veterans, and drive to protect the environment, to the recreational joys of riding motorcycles and horses. JA252, 258, 260-61, 284. Drivers then publicize their agreement with these causes or ideals by purchasing custom plates.

---

[17] *But see Choose Life Ill., Inc. v. White*, 547 F.3d 853, 868-69 (7th Cir. 2008) (Manion, J., concurring) ("A 'Choose Life' plate does not speak to whether abortion should be legal, but instead recognizes that under our legal system only pregnant women can choose whether or not to have an abortion. The message simply recommends that a woman contemplating abortion choose life for her unborn child.").

31

As other courts have recognized, vehicle identification is amply achieved by regular plates; custom plates are designed with a different purpose in mind, *i.e.*, producing "revenue" for nonprofits and the State by accommodating "the private expression of various views." *Sons of Confederate Veterans v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 619 (4th Cir. 2002); *see Ariz. Life Coal.*, 515 F.3d at 965 (recognizing the focus is not on "the primary purpose of any vehicle license plate" but the "*specialty license plate* program as a whole"). Nonprofit organizations enter the forum to "promote their messages" and raise funds to support their work, *Roach*, 560 F.3d at 867, while drivers purchase custom plates to "give vent to the[ir] personality" and associate themselves with certain identifying "character[istics] or views." *Lewis*, 253 F.3d at 1079. Indeed, the Department promoted the program using the slogan "Take Your Pride for a Ride," and designed a plate category specifically for nonprofit "Causes." JA211, 219.

Critically, many viewpoints reflected in New York's custom plate forum relate to the same subjects addressed by CFF's pro-adoption speech. The Commissioner approved, for instance, plates advocating breast cancer research and domestic violence prevention as a means of furthering women's health, as well as plates addressing children's welfare in the form of autism awareness and programs to keep youth free of alcohol and drugs. JA 252-53, 254. Instead of medical research or anti-addiction efforts, CFF views adoption as a crucial means of

32

furthering the mental and physical health of women with unplanned pregnancies, as well as the societal welfare of their unborn children. "Abortion-related" speech is thus nothing more than a contrived subcategory of expression the Commissioner invented to obscure "the line between subject and viewpoint." *Sammartano*, 303 F.3d at 971; *see infra* p. 39-40.

This Court should not be taken in by the ruse. Written guidelines governing access to the custom plate forum contain no subject-matter restrictions, let alone a ban on abortion-related speech. Indeed, banning "any plate that could be interpreted as supporting one side or another of a controversial issue," Opening Br. at 49 (quotation omitted), would invalidate the entire custom plate forum, which is designed to allow drivers to publicize their viewpoints on an unbounded series of topics—none of which are uncontested. As a case in point, a prohibition on supporting "one side" of an issue would certainly invalidate custom plates the Commissioner approved for the Yankees and the Mets. JA238, 230-47. The obvious impracticability of this purported ban on "one sided" speech, which the Department selectively applied only to "Choose Life" custom plates, renders this argument "unworthy of credence" and serves as "persuasive" evidence of "intentional discrimination" against CFF's pro-adoption views. *Schnabel v. Abramson*, 232 F.3d 83, 89 (2d Cir. 2000)

33

That no content-based restriction governs access to the custom plate forum is also reflected in the Commissioner's "laissez-faire policy" of approving plates requested by "almost anyone willing to pay the required fee (despite a purported policy of refusing controversial" speech).  *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1153 (7th Cir. 1995); JA210; *cf. Lamb's Chapel*, 508 U.S. at 391.  Over the years, the Commissioner approved multiple custom plates with controversial viewpoints, including plates supporting rival teams like the New York Knicks and Miami Heat, Harley enthusiasts, esoteric societies like the Masons, the War on Terror, and union rights.  JA232-33, 259-60, 284, 367.  This "willingness," in practice, "to accept almost any message" simply precludes the argument that CFF's message is "incompatible" with the purpose of the custom plate forum.  *Air Line Pilots Ass'n*, 45 F.3d at 1153.

### 2. The Commissioner's Ostensibly Content-Based Restriction On The Custom Plate Forum Cannot Withstand Scrutiny.

Certain circumstances will lead a court to reject "seemingly neutral justifications offered by the government" to "exclude speech."  *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004).  One of these situations occurs when the government allegedly bans certain kinds of expression, but accepts other things "possessing the same characteristic."  *Id.* (citing *Cornelius*, 473 U.S. at 812).  Similar concerns arise when the neutral ground offered to justify the exclusion is not well served "by the specific governmental action at issue;" *i.e.*,

34

where "the fit between means and ends is loose or nonexistent." *Id.* (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

Both of these troubling factual scenarios are present here. First, the Commissioner contends the Department has a longstanding practice of excluding controversial speech from the custom plate forum. But several approved plates address issues that are far more "controversial" than CFF's pro-adoption message. The Commissioner, for instance, approved a custom plate for the nonprofit organization Cop Shot, which features a blood splattered logo replete with the "o" in "Shot" pictured in a cross-hair and a tagline that reads "SUPPORT POLICE."[18] JA259, 376. Individuals and groups who feel personally or historically targeted by law enforcement will unquestionably find this plate to be "controversial." And the Department itself appears to have deemed Cop Shot's logo to be contentious, as it uniquely omits a visual depiction of the plate on its website. JA259.

The list goes on. A New York veteran's plate received the Commissioner's approval that advertises drivers' participation in the "WAR ON TERROR."[19] JA284. Over a decade of heated debate surrounding the legality of the Wars in Iraq and Afghanistan, the deaths of civilians, the treatment of prisoners held at Abu

---

[18] A color picture of this plate is available online. *See* Plate Shack, New York, *available at* http://www.plateshack.com/y2k/New_York/nycopshot.jpg (last visited June 25, 2012).

[19] A color picture of this plate is available online. *See* Plate Shack, New York, *available at* http://www.plateshack.com/y2k/New_York2/ny-waronterrorvet.jpg (last visited June 25, 2011).

Ghraib prison, the long-term detention of prisoners at Guantanamo Bay, and the deaths of thousands of American servicemen and women, among other issues, renders this plate clearly controversial. Yet, the Commissioner had no qualms about "road rage" inspired by the "WAR ON TERROR" plate, or two other plates reserved for veterans of the oft-maligned War in Vietnam. JA284.

This selective application of the alleged ban on controversial speech significantly undermines "the credibility" of the Commissioner's "rationale for" excluding CFF's message. *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). Indeed, the Commissioner's approval of "controversial" plates touching upon the rivalry between Dale Earnhardt and Jeff Gordon, the priority of organ donation,[20] the War on Terror, membership in exclusive societies, and union rights demonstrates that the Department's "policy" against messages "that could be interpreted as supporting one side or another of a controversial issue" is illusionary. Opening Br. at 49 (quotation omitted); *see* JA225-26, 253, 258-60, 263, 284. Such an "underinclusive" regulation of expression would violate the First Amendment, in any case, because it allows government to control the marketplace of ideas by "select[ing] the 'permissible subjects for public debate.'" *City of Ladue*, 512 U.S. at 51; *see also Jana-Rock Constr, Inc. v. N.Y. State Dep't*

---

[20] *See* Rob Stein, Washington Post, Changes in Controversial Organ Donation Method Stir Fears, *available at* http://www.washingtonpost.com/national/health-science/changes-in-controversial-organ-donation-method-stir-fears/2011/09/15/gIQAlY9agK_story.html (last visited June 25, 2012).

*of Econ. Dev.*, 438 F.3d 195, 207 n.6 (2d Cir. 2006) (discussing "underinclusiveness").

None of the Commissioner's "*ipse dixits* … explain why" so-called abortion-related speech must "alone … bear the burden of the" alleged ban on controversial expression in the custom plate forum.[21] *Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544 (1993); *see also Air Line Pilots Ass'n*, 45 F.3d at 1153 (noting that government may not "invoke an otherwise unenforced policy to justify th[e] suppression" of private speech). Indeed, the Commissioner's narrow exclusion of CFF's message is clearly unjustifiable in light of the Department's approval of special vanity plates bearing the same "Choose Life" message. CFF's directors and members obtained specialty plates from the Department reading "CHS@LIFE," "CHZ@LIFE," "CHSE@LFE," and "CHSELIFE." *See* JA449-52, 455-57. The Commissioner also issues a life-affirming custom plate reading "Life… Pass It On" to promote organ donation, but denied CFF's life-affirming plate reading "Choose Life" to promote adoption. JA253. No rational distinction exists between the messages expressed through these plates and CFF's pro-adoption plate, which the Commissioner rejected.

---

[21] *See also City of Hialeah*, 508 U.S. at 543 (recognizing that "the general applicability" principle being discussed has "parallels in [the Court's] First Amendment jurisprudence").

Moreover, the Commissioner approved several "UNION YES" plates that feature a checked ballot box. Drivers may obtain this plate with or without the name of two prominent unions in the tagline position— AFL-CIO[22] or NYSUT— along with a corresponding union logo inside of the "UNION" "o". JA367. There is no question that the merit of unions is a hotly contested issue that has often been accompanied by violence. JA1551-1647 (documenting this trend). A recent example of this conflict emerged in Wisconsin where a dispute over public-employee unions resulted in a virulent effort to recall the governor of that state, events that were closely followed nationwide.[23]

But the Commissioner, based solely on his own perception of the popularity of organized labor, deemed the blatantly political message "vote pro-union" uncontroversial. As Dunne explained, a "vote pro-union" message is permissible because union plates are "issued by a governmental agency in a state with a tremendous amount of respect for its unions, its public employees and the labor movement in general."[24] JA1363.

---

[22] A color picture of this plate is available online. *See* Plate Shack, New York, *available at* http://www.plateshack.com/y2k/New_York2/ny-aflcio.jpg (last visited June 25, 2012).

[23] *See, e.g.*, Steven Greenhouse, New York Times, Union … Selects a New President, *available at* http://www.nytimes.com/2012/06/22/business/union-defensive-after-wisconsin-vote-prepares-for-a-new-leader.html?pagewanted=all (last visited June 25, 2012).

[24] Importantly, the Commissioner explicitly relied on another instance of Dunn's reasoning in denying CFF's custom plate application. JA439.

In other words, "vote pro-union" messages are acceptable because the Commissioner views them as widely popular in New York. The impression that a substantial number of New York residents would view CFF's pro-adoption message less favorably, means that CFF's plate is disallowed. *See* JA409 (opining that "a significant segment of the population … finds ["Choose Life"] plates to be 'patently offensive.'"); JA438 (explaining the Commissioner would "not voluntarily put" a message on "public roadways that will incite … anger and outrage"). No clearer evidence is required that the Commissioner excluded CFF's custom plate based on the perceived popularity of its viewpoint, not a neutral, content-based proscription. *See Amidon*, 508 F.3d at 101-02.

There is also a poor fit between the Commissioner's asserted goal of prohibiting controversial speech in the custom plate forum and the Department's decision to exclude CFF's pro-adoption message. *See Ridley*, 390 F.3d at 87. All of the Commissioner's concerns about CFF's custom plate turned on his judgment that the words "Choose Life" take a controversial position on the issue of abortion rights. But, as Judge Manion's concurrence in *Choose Life Illinois* explains, this is simply not the case.

"Choose Life," as a message, "acknowledges both choice and life." *Choose Life Ill.*, 547 F.3d 853, 867 (Manion, J., concurring). It takes no position on the legality of abortion. The vast majority of New York residents would agree with

39

"this message," which "is directed at pregnant women … contemplating abortion," as even the most ardent supporters of abortion rights support efforts to "reduce the number of abortions and even make them 'rare.'" *Id.* at 868; *see also* JA303, 318-21 (reproducing statements from high-profile supporters of abortion rights in praise of CFF's mission and work).

CFF's pro-adoption message fully comports with this generally-accepted goal. After all, adoptions cannot occur unless "someone has … intervene[d] … to encourage the mother to carry her baby to term." *Choose Life Ill.*, 547 F.3d at 868 (Manion, J., concurring); *see also* JA309. Thus, CFF's "Choose Life" tagline directly supports its pro-adoption message and implicates no disputes—let alone "one side" of them—as the Commissioner suggests. That is presumably why the Commissioner instituted an eight-year hiatus on approving new custom plates instead of openly denying CFF's revised plate, while simultaneously allowing the sale of 238 previously approved plates to go ahead. *See* JA55, 476.

The Department's use of an alleged ban on controversial expression uniquely to exclude CFF's plate, while authorizing hundreds of others that present "one side" of a given topic, constitutes a viewpoint-discriminatory penalty, not a neutral, content-based restriction. *See Ridley*, 390 F.3d at 87.

40

**D.    The Commissioner's Exclusion Of All Abortion-Related Speech Unlawfully Discriminates On The Basis of Viewpoint.**

In addition to being viewpoint discriminatory on its face, it is undisputed that the Commissioner has applied the Department's purported ban on controversial expression solely to exclude abortion-related speech. *See* Opening Brief at 11, 24-25. The district court rightly concluded that the Commissioner's alleged "exclusion of the entire subject of abortion from the forum … is discrimination based on viewpoint, which runs afoul of the First Amendment." *Children First Foundation*, 829 F. Supp. 2d at 62.

Significantly, the Commissioner has opened the custom plate forum to a wide range of healthcare-related topics. Nonprofit organizations accordingly stake out a variety of positions on common disorders like autism and diabetes, the importance of research into diseases like breast cancer and multiple sclerosis, the importance of keeping youth free of alcohol and drugs, and even the moral value of organ donation using the tagline "Life… Pass It On." JA252-53. Those interested in a host of social causes also have their say. Nonprofit groups may support the ideals and values of Martin Luther King, Jr., decry the horrors of domestic violence, trumpet the importance of the arts, remind others of the importance of animal welfare, and promote environmental awareness. JA252, 254, 260. Society is only bereft of the views of organizations like CFF whose ideas touch upon topics

41

such as women's health, children's welfare, and the social and moral good of adoption in a manner the Commissioner deems tainted by the abortion issue.[25]

In *Rosenberger*, the Supreme Court explained that discrimination "against an entire class of viewpoints" on a topic constitutes viewpoint discrimination just as much as the "exclusion of only one." 515 U.S. at 831. Public discourse, the Court explained, is much too "complex and multifaceted" to be viewed as operating in a "contrived" system of dualistic views. *Id.* Silencing "multiple voices" on a given topic skews "the marketplace of ideas" in "multiple ways." *Id.* at 831-32. Accordingly, the exclusion of "several views" on a societal problem is just "as objectionable" as excluding "one, the other, or yet another political, economic, or social viewpoint." *Id.* at 831.

Courts have applied this principle in several cases involving custom plates. Most recently, this Court rejected Vermont's contention that a ban on all religious speech in a specialty plate forum was "by definition viewpoint-neutral." *Byrne v. Rutledge*, 623 F.3d 46, 58 (2d Cir. 2010) (quotation omitted). The *Byrne* panel specifically recognized that "this argument" was "expressly considered—and

---

[25] This is textbook viewpoint discrimination, as the Commissioner excludes CFF from speaking on women's health, children's welfare, and other issues that are "otherwise permissible" because CFF approaches them "from a [pro-adoption] standpoint." *Lamb's Chapel*, 508 U.S. at 394; *see supra* p. 32-33. The First Amendment exists to forbid just such regulations of speech "that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel,* 508 U.S. at 394 (quotation omitted).

rejected—by the Supreme Court" in *Rosenberger*. *Id.* Indeed, the dissenters in *Rosenberger* argued that a ban on all speech "manifesting a belief *about* a deity involved no viewpoint discrimination." *Id.* (quotation omitted). The majority rejected this line of reasoning because it was based on the "insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech." *Id.* (quotation omitted).

To the contrary, the Supreme Court explained that excluding several views on a broad-scale social problem like racism "'is just as offensive to the First Amendment as exclusion of only one.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 831). The *Byrne* Court accordingly held that "Vermont's ban on all religious messages in a forum it … otherwise broadly opened to comment on a wide variety of subjects, including personal philosophy, affiliation, and belief, serve[d] not to restrict content but instead to discriminate against a specific premise, perspective, and standpoint," *i.e.*, religious viewpoints. *Id.* at 59 (quotation and alteration omitted).

Three circuits have applied this principle outside the context of religious speech. Directly on point is the Ninth Circuit's decision in *Arizona Life Coalition*, which considered an administrative process whereby nonprofits in Arizona could obtain custom plates. *See* 515 F.3d at 960-61. Once Arizona Life Coalition, Inc. ("ALC") demonstrated that it met all of the statutory criteria, its application was

43

forwarded to the Arizona License Plate Commission for consideration. *Id.* at 961.

Commission members raised concerns as to whether ALC's message would be

attributed to the state and whether groups with opposing viewpoints would also

request custom plates. *Id.* After initially declining to take any action, the

Commission rejected ALC's application by voice vote. *Id.* at 962.

Before the Ninth Circuit, Arizona argued that as long as it did not issue a

plate opposing ALC's message the exclusion of ALC's custom plate would not

discriminate on the basis of viewpoint. *Id.* at 971. The Ninth Circuit disagreed,

relying mainly on the principle that once "government has chosen to permit

discussion of certain subject matters, it may not then silence speakers who address

those subject matters from a particular perspective." *Id.* at 972 (quotation omitted).

Because ALC's "abortion-related speech" fell "within the boundaries of" the

custom plate forum and the only reason to exclude it was "based on the nature of

the message," the Ninth Circuit concluded that "the Commission's actions were

viewpoint discriminatory." *Id.*

*Arizona Life Coalition* is instructive because its facts closely resemble those

at issue here. Nothing written into New York law excludes CFF's pro-adoption

message, even if it is considered "abortion-related." *Id.* And the Department's

written explanation for its denial of CFF's custom plate relied on the "patently

offensive" and "controversial" nature of its viewpoint, not a content-based limitation designed to preserve the forum's purpose. *Id.*

Moreover, the purported policy against controversial expression is null and void because the Commissioner failed to establish "objective criteria" governing its application. *Id.* This Court is thus left with a case in which the Commissioner's rejection of CFF's custom plate is based solely "on the nature" of its pro-adoption message. *Id.* As the Ninth Circuit explained, the "'exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one.'" *Id.* at 971 (quoting *Rosenberger*, 515 U.S. at 831).

The accuracy of the Ninth's Circuit's approach is confirmed by the Sixth Circuit's opinion in *United Food*. In that case, an Ohio transit authority denied a union's "proposed wrap-around bus advertisement on the grounds that the ad was too controversial." 163 F.3d at 346. Controversy, as the Sixth Circuit explained, may result either because "the *form* of … communication [is] offensive," or because "the listener disagrees with the speaker's message." *Id.* at 361 (quotations omitted).

Government may permissibly regulate the former but not the latter. *See id.* at 361. As this Court explained in the context of Vermont's specialty plate forum, prohibiting the use of scatological terms only impacts the form of speech and "does not discriminate on the basis of viewpoint." *Perry v. McDonald*, 280 F.3d 159,

169-70 (2d Cir. 2001). The Sixth Circuit consequently focused on whether a ban on controversial expression could lead state "officials to reject a proposed advertisement because of the viewpoint expressed." *United Food*, 163 F.3d at 361. It ultimately concluded that a ban on "controversial anti-union viewpoints as well as controversial pro-union positions" was impermissible because "the 'exclusion of several views on [an issue] is just as offensive to the First Amendment as exclusion of only one.'" *Id.* at 362 (quoting *Rosenberger*, 515 U.S. at 831).

The only Court to ignore the Supreme Court's guidance on this issue is the Seventh Circuit in *Choose Life Illinois*. That court considered a specialty plate program that—unlike New York's—required legislative approval of every custom plate. *See* 547 F.3d at 855, 858. Choose Life Illinois, Inc.'s ("CLI") request for a plate was referred to the legislature for approval, but died in subcommittee. *Id.* at 855. Subsequently, CLI brought suit, arguing that the State unconstitutionally discriminated against its viewpoint. *Id.* at 857.

The Seventh Circuit disagreed based on the fact that "Illinois ha[d] excluded the entire subject of abortion from its specialty-plate program." *Id.* at 865. *But see id.* at 867 (Manion, J., concurring) (disputing this assertion). Viewing the matter at an artificially low level of generality, the Seventh Circuit accepted—with next to no analysis—that Illinois had "restricted access to the specialty-plate forum on the basis of the *content*" by "saying, in effect, 'no abortion related specialty plates,

46

period.'" *Id.* It disagreed with the Ninth Circuit's reliance on *Rosenberger* because the cited "passage actually undermine[d] [its] conclusion." *Id.* at 866. But the Seventh Circuit never explained why this was the case.

Rather, the Court stated in a conclusory fashion that Illinois had "effectively imposed a restriction on access to the specialty-plate forum based on subject matter: no plates on the topic of abortion," which did "not disfavor[] any particular perspective or favor[] one perspective over another on that subject." *Id.* In so doing, the Seventh Circuit contravened its own binding precedent, which explains that the fact "that an entire category of speech is banned … hardly satisfies a viewpoint inquiry." *Air Line Pilots Ass'n*, 45 F.3d at 1159; *see also Grossbaum*, 100 F.3d at 1299. The correct approach is to determine "whether or not the forum has included speech on the same general subject matter. If this is the case, then suppression of a proposed but distinct view because of some content element included in it is impermissible." *Air Line Pilots Ass'n*, 45 F.3d at 1160.

That is the exact line of inquiry the Ninth Circuit undertook and the underlying basis for its holding that Arizona's exclusion of a "Choose Life" message contravened the First Amendment. *See Ariz. Life Coal.*, 515 F.3d at 972 (citing *Sammartano*, 303 F.3d at 971, which relies on *Grossbaum*, 100 F.3d at 1298, which reaffirms *Air Line Pilots Ass'n*, 45 F.3d at 1159-60). Accordingly, this Court should not follow *Choose Life Illinois'* flawed logic. Out-of-circuit

47

precedent is only as persuasive as its reasoning. *See, e.g.*, *Peerless Imps., Inc. v. Wine, Liquor & Distillery Workers Union Local One*, 903 F.2d 924, 928 (2d Cir. 1990). In this instance, the *Choose Life Illinois* panel's failure to follow the Supreme Court's guidance in *Rosenberger* and controlling Seventh Circuit precedent robs its opinion of all persuasive value.

### E. The Commissioner's Exclusion Of CFF's Pro-Adoption Message Is Unreasonable Given The Purpose Of The Custom Plate Forum.

The reasonableness of a speech exclusion depends upon "the purpose of the forum and all the surrounding circumstances." *Byrne*, 623 F.3d at 59 (quotation omitted). No such prohibition is reasonable unless government demonstrates, at a bare minimum, that the exclusion serves "a legitimate [g]overnment interest." *Id.* (quotation omitted). Here, the Commissioner fails to assert any such interest in support of expelling CFF's viewpoint from the custom plate forum.

"Patently offensive" speech may only be constitutionally excluded in the case of obscenity,[26] a category of expression outside of the First Amendment's protection. *See IMS Heath Inc. v. Sorrell*, 630 F.3d 263, 272 (2d Cir. 2010). Even in the obscenity context, whether speech is protected depends not on "majority approval" or "the degree of local acceptance it has won." *Pope v. Illinois*, 481

---

[26] *See, e.g.*, *United States v. Irving*, 432 F.3d 401, 411 (2d Cir. 2005) ("Obscene material is that which taken as a whole, appeals to the prurient interest, is patently offensive in light of community standards, and lacks serious literary, artistic, political or scientific value."); *supra* p. 24 n.14.

U.S. 497, 500 (1987). Instead, it depends on the objective determination of "whether a reasonable person would" find that speech holds "serious literary, artistic, political, or scientific value." *Id.* at 501. The Department's regulation barring "patently offensive" speech contains no such objective criteria, nor is there evidence the Commissioner applied any. *But see Ariz. Life Coal.*, 515 F.3d at 972 ("Restrictions based on community standards of decency must be based on objective criteria set out in advance." (quotation omitted)),

All that exists in the record is the Commissioner's arbitrary finding that "a significant segment of the population" would find CFF's "Choose Life" tagline "to be 'patently offensive.'" JA409. This conclusion is not only incongruous as a matter of fact, *see supra* pp. 39-40, but also contravenes the Supreme Court's holding that government cannot ban speech based on contemporary community standards alone. *See Pope*, 481, U.S. at 500-01 & n.3. The Commissioner's regulation against "patently offensive" expression is thus unreasonable as a matter of law.

The Commissioner's alleged practice of banning controversial expression fares no better. Even "[a]ssuming" this constitutes a "legitimate government interest[]," the Commissioner has not applied it in a reasonably "consistent" manner. *Byrne*, 623 F.3d at 60. A ban on speech is unreasonable when the government's practice "not infrequently results … in the issuance of plates that

49

contravene [its] asserted interests." *Id.* at 61. Here, the Commissioner has approved multiple plates—including the "New York Islanders" and "New York Rangers," "Harley Owners," "Masons," "Cop Shot," "War on Terror," and "Union Yes" plates—that are indisputably controversial, as well as "Choose Life" specialty plates that contain the same message as CFF's custom plate. *See* JA241, 259-60, 263, 284. The Commissioner's exclusion of CFF's custom plate is therefore "an unreasonable and thus impermissible restriction on expression."[27] *Byrne*, 623 F.3d at 61.

## II. CFF'S CUSTOM PLATE IS PRIVATE SPEECH ENTITLED TO THE FULL PROTECTION OF THE FIRST AMENDMENT.

The Supreme Court established over thirty years ago that license plates impact the expressive rights of private parties and are thus subject to examination under the First Amendment. *See Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977). Nonetheless, the Commissioner seeks to nullify these rights by positing a novel legal theory of hybrid or mixed government-private speech that would place CFF's ability to express its views completely at the mercy of the State. *See* Opening Br. at 45. Although this argument, supported by not a single case cite, is unsupportable as a matter of law, it notably reinforces the Department's assertions

---

[27] Because "[t]he proposition that [government] does not endorse everything [it] fail[s] to censor is not complicated," the Commissioner's fears regarding the endorsement of CFF's message are clearly unreasonable. *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990).

of unfettered discretion to approve only those nonprofit messages with which the Commissioner agrees.  *See supra* pp. 28-29.

The propriety of the Commissioner's hybrid-speech argument is highly questionable given that, before the district court, "Defendants … agree[d] that as long as at least some private speech is involved, *a forum analysis is required*." *Children First Found.*, 829 F. Supp. 2d at 55 n.5 (emphasis added).  This argument thus appears to be waived.  *See United States v. Stewart*, 485 F.3d 666, 673 (2d Cir. 2007) (recognizing that conceding a point in the district court may waive an argument on appeal).

Furthermore, because "custom license plates involve, at a minimum, some private speech," this Court previously held that "it would not have been reasonable for" the Commissioner to conclude that the "government speech doctrine" would "permit[] viewpoint discrimination in this case." *Children First Found.*, 169 Fed. App'x at 639 (internal citations omitted).  A determination that the First Amendment applied was thus a necessary prerequisite to this Court's qualified immunity analysis.[28]  Certainly, the Department fails to explain why qualified immunity was denied if the Commissioner arguably had the right to pick and

---

[28]  The Commissioner cannot avoid this Court's previous holding by claiming it lacked jurisdiction to render a binding judgment.  Although this Court determined that jurisdiction was lacking due to the vagaries of qualified immunity jurisprudence, a court always "has jurisdiction to determine its own jurisdiction." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 292 (1947).

choose which nonprofits may speak. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 570 (2d Cir. 1996) (recognizing arguable violations of law result in a grant of qualified immunity). There is consequently no reason for this Court to reconsider its prior analysis. *See In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (noting a court should not revisit its prior rulings absent cogent and compelling grounds).

Regardless, no court has applied the hybrid government-private speech theory to deny First Amendment protection to private expression. It is true that judges of the Fourth and Sixth circuits have characterized custom plates as a mixture of government and private speech. *See ACLU of Tenn. v. Bredesen*, 441 F.3d 370, 381 n.2 (6th Cir. 2006) (Martin, J., concurring in part and dissenting in part); *Planned Parenthood of S.C. v. Rose*, 361 F.3d 786, 794-95, 800 (4th Cir. 2004) (opinions of Michael, J. and Luttig, J.); *Sons of Confederate Veterans v. Comm'r of Va. Dep't of Motor Vehicles*, 305 F.3d at 241, 245 (4th Cir. 2002) (Luttig, J., respecting the denial of rehearing en banc). But all of these jurists recognized the private speech aspect as controlling and applied the First Amendment's viewpoint-neutrality principle in full force. *See Bredesen*, 441 F.3d at 381 & n.2; *Rose*, 361 F.3d at 795-98, 800; *Sons of Confederate Veterans*, 305 F.3d at 247.

The Commissioner's mixed government-private speech argument thus has no foundation in existing law.[29]  Indeed, even the judicial supporters of a hybrid speech theory that *respects* viewpoint neutrality recognize that their ideals fall outside of existing Supreme Court precedent.  *See, e.g.*, *Rose*, 361 F.3d at 795 ("[T]he Supreme Court has not yet recognized that speech can be governmental and private at the same time ….") (opinion of Michael, J.); *Sons of Confederate Veterans*, 305 F.3d at 245 ("[T]he Supreme Court … has never held that a message can be both that of a private individual and that of the government.") (Luttig, J., respecting the denial of rehearing en banc).  The Commissioner's hybrid speech argument is thus a moot point given this Court's inability "to depart from binding Supreme Court precedent unless and until the court reinterprets" it.  *OneSimpleLoan v. U.S. Sec'y of Educ.*, 496 F.3d 197, 208 (2d Cir. 2007) (quotation and alterations omitted).

---

[29]  In a poorly reasoned decision, the Sixth Circuit held that Tennessee's *legislatively-created* custom plates consisted entirely of government speech. *Bredesen*, 441 F.3d at 375-77.  Every other circuit to consider the matter has rightly determined that custom plates represent private speech.  *See Sons of Confederate Veterans*, 288 F.3d at 621; *Choose Life Illinois*, 547 F.3d at 863-64; *Roach*, 560 F.3d at 867-68; *Ariz. Life Coalition*, 515 F.3d at 968; *Women's Emergency Network v. Bush*, 323 F.3d 937, 945 n.9 (11th Cir. 2003).  Importantly, the Commissioner concedes that custom plates include at least some private expression and accordingly does not contend, under *Bredesen*, that the government speech doctrine applies.  *See* Opening Br. at 44 n.12 (citing *Bredesen* and recognizing this Court has rejected the argument that license plates are exclusively government speech).

It is not difficult to see why the Supreme Court has declined to tilt at such windmills. Forum doctrine was specifically designed to account for instances in which private expression affects "government-owned property or a government program." *Pleasant Grove City v. Summum*, 555 U.S. 460, 478 (2009). Consequently, the familiar standards for speech restrictions in traditional, designated, limited, and nonpublic fora already incorporate "the appropriate degree of deference owed to" government officials. *Amidon*, 508 F.3d at 105. This Court should decline to "grant [any] additional latitude" to the Commissioner, much less invalidate forum analysis altogether by conceding the requested authority to veto disfavored speech.[30] *Id.*

The dearth of supporting caselaw in the Commissioner's brief is unsurprising given this Circuit's longstanding forum precedents. Both *Perry* and *Byrne* recognized that specialty plates are "private individual[] speech" in a government forum, *Perry*, 280 F.3d at 166, restrictions which "are analyzed under a 'forum-based' approach." *Byrne*, 623 F.3d at 53. New York's custom plate forum for nonprofits differs from the Vermont special plate forum for individuals this Court considered in prior cases, but only as to who could access the forum and what aspects of the plate are opened for the expression of private views. *See*

---

[30] *See Lamb's Chapel*, 508 U.S. at 394 ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." (quotation omitted)).

54

*Children First Found.*, 829 F. Supp. 2d at 56.  Consequently, as conceded below, traditional forum analysis undoubtedly governs this case.  *See id.*  As a result, the Court's only task is to establish the type of forum that exists, which sets the standard governing the Commissioner's expulsion of CFF's pro-adoption views. *See Byrne*, 623 F.3d at 53; *Perry*, 280 F.3d at 166.

It is also important to recognize that despite the Commissioner's alarmist claims, CFF is not coercing the Department to operate a speech forum, let alone "speak."  The choice to open custom plates to private expression is the Commissioner's alone.  All CFF asks is for the Commissioner to direct the forum in accordance with basic constitutional guarantees.  *See supra* p. 28-29.

## III. THE COMMISSIONER VIOLATED CFF'S FIRST AMENDMENT RIGHTS BY EXCLUDING ITS CUSTOM PLATE FROM A DESIGNATED OR LIMITED PUBLIC FORUM.

Because the Commissioner's viewpoint discriminatory exclusion of CFF's custom plate is unlawful regardless of the type of forum, this Court need not engage in forum analysis.  *See Sons of Confederate Veterans*, 288 F.3d at 623. But, contrary to the Commissioner's assertions, the forum opened to 238 nonprofit custom plates is correctly categorized as a designated or limited public forum, which need not be open to all speakers or even the discussion of all subjects.  *See Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 46 & n.7 (1983).

As this Court recently explained, designated public fora result when the government intentionally opens an otherwise closed forum for purposes of "communicating thoughts between citizens, and discussing public questions." *Zalaski v. City of Bridgeport Police Department*, 613 F.3d 336, 341 (2d Cir. 2010). Content-based restrictions in such fora must be narrowly tailored and "serve a compelling government interest." *Id.*

Limited public fora are established in the same manner except the government intentionally limits participation therein "to certain kinds of speakers or to the discussion of certain subjects." *Id.* at 342 (quotation omitted). Government's ability to make content-based restrictions in these fora depends on whether a party's "expressive activities" are inside "the general purpose for which the government opened the forum." *Id.* If so, "strict scrutiny" applies; otherwise, speech regulations "need only be reasonable and viewpoint neutral." *Id.*

The Commissioner voluntarily designated custom plates as a forum in which nonprofit organizations could speak "in the hopes of raising money to support their cause," while simultaneously generating revenue for the Department. *Arizona Life Coal.*, 515 F.3d at 965. In so doing, the Commissioner "intentionally open[ed] a nontraditional forum for public discourse." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) (quotation omitted).

56

The Commissioner subsequently granted at least 259 plate applications from nonprofits without any notable rejections apart from "Choose Life" custom plates. *See supra* p. 14 & n.9. Thus, although the Commissioner's permission is required to access the forum, that assent has been "freely given" to nonprofit organizations advocating a broad spectrum of views. *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 230 (2d Cir. 1996). It is well established that government creates a public forum when it generally grants access "as a matter of course." *Perry Educ. Ass'n*, 460 U.S. at 47; *see also Lamb's Chapel*, 508 U.S. at 391.

Normally, this Court would inquire whether the Commissioner's designated public forum is limited or unlimited. The difference is immaterial in this case because CFF's expression undoubtedly aligns with "the general purpose for which the government opened the" custom plate forum, *Zalaski*, 613 F.3d at 342; *i.e.*, to "produce revenue [through] the private expression of various views." *Sons of Confederate* Veterans, 288 F.3d at 619. Strict scrutiny therefore applies and the Commissioner, for all of the reasons stated above, cannot demonstrate that the exclusion of CFF's pro-adoption speech is narrowly tailored to serve a compelling State interest. As a result, the Commissioner violated the First Amendment by uniquely expelling CFF from the custom plate forum.

57

**IV.   THE COMMISSIONER'S CUSTOM PLATE REGULATIONS ARE IMPERMISSIBLY VAGUE AND CONSTITUTE AN UNCONSTIUTIONAL PRIOR RESTRAINT.**

The void-for-vagueness doctrine is "one of the most fundamental protections of the Due Process Clause." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (quotation omitted).   It serves to invalidate vague regulations that fail to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" or "authorize[] or even encourage[] arbitrary and discriminatory enforcement."   *Id.* (quotation omitted).   These protections against "ad hoc and subjective" decisionmaking are at their height when the "right of free speech" is at stake.   *Fox Television Stations, Inc. v. FCC*, 613 F.3d 317, 328 (2d Cir. 2010) (quotations omitted), *vacated on other grounds by* _ S. Ct. _, 2012 WL 2344462 (2012).

In this case, the Commissioner's regulation against patently offensive speech and alleged ban on controversial expression lack *any* objective criteria whatsoever. They consequently encourage "subjectivity and discriminatory enforcement" in the Commissioner's administration of the custom plate forum.   *Id.*   Because such provisions "impermissibly delegate[] basic policy matters to government officials," they are void for vagueness.   *Id.* (quotation omitted).

Access to the custom plate forum is further conditioned on the Commissioner's "administrative approval," thus establishing a "prior restraint" on

58

speech. *Lusk*, 475 F.3d at 485. Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights" and therefore carry "a heavy presumption" of unconstitutionality. *Id.* (quotations omitted). To survive, these regulations must incorporate "narrow, objective, and definite standards to guide the licensing authority['s]" decisionmaking process. *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 150 (2d Cir. 2005) (quotation omitted).

The Commissioner has established no objective standards here, let alone regulations that could be described as "narrow" or "definite." *Id.* As the Supreme Court has explained, "'[it] is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted [and] engage in invidious discrimination among persons or groups'" through regulations establishing "'a system of broad discretionary licensing power.'" *Lusk*, 475 F.3d at 486 (quoting *Cox v. Louisiana*, 379 U.S. 536, 557 (1965)). CFF's arbitrary exclusion from the custom plate forum is therefore unconstitutional on this ground as well.

## V.   THE COMMISSIONER VIOLATED CFF'S RIGHT TO THE EQUAL PROTECTION OF THE LAWS.

The Equal Protection Clause of the Fourteenth Amendment requires government to treat "all persons similarly situated … alike." *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (quotation omitted). This is particularly true when government makes distinctions that "affect[] fundamental

rights," which are subjected to "the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

Here, CFF's fundamental right to free speech is at stake and the Commissioner does not dispute that CFF is similarly situated to the other nonprofit organizations granted access to the custom plate forum. The Commissioner's discriminatory exclusion of CFF's pro-adoption speech is accordingly unconstitutional. As the Supreme Court has explained, denying a group access to an expressive forum "'because of [its] views,'" while at the same time "'allowing other groups … to voice opinions on other subjects,'" constitutes "'invidious discrimination forbidden by the Equal Protection Clause of the Fourteenth Amendment.'" *Mosley*, 408 U.S. at 98 (quotations omitted).

## VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ORDERING THE COMMISIONER TO GRANT CFF'S APPLICATION FOR A CUSTOM PLATE.

District courts possess "broad discretion to frame equitable remedies for constitutional violations so long as the relief granted is commensurate with the constitutional infraction." *United States v. Brennan*, 650 F.3d 65, 138 (2d Cir. 2011) (quotation omitted). Accordingly, this Court reviews the scope of injunctive relief only for "an abuse of discretion." *Patsy's Italian Rest.*, 658 F.3d at 272.

The injury in this case is CFF's discriminatory exclusion from the custom plate forum. An injunction requiring the Commissioner to grant CFF admittance to

60

the forum is the *only* remedy available to correct that wrong. Consequently, the district court did not abuse its discretion in ordering the Commissioner to issue CFF's custom plate. To the contrary, this order comports with other circuits' unanimous endorsement of injunctions requiring government officials to issue plates rejected on discriminatory grounds. *See Sons of Confederate Veterans*, 288 F.3d at 614, 629 (approving an injunction requiring a state official to issue a custom plate); *Roach*, 560 F.3d at 871 (same); *see also Lewis*, 253 F.3d at 1082 (requiring the issuance of an improperly rejected plate); *Arizona Life Coal.*, 515 F.3d at 972 (same).

The Commissioner cites only two contrary opinions, which involve custom plate programs requiring legislative approval. These decisions turn *not* on the scope or exercise of district courts' remedial powers but on the vagaries of state law. *See Sons of Confederate Veterans v. Atwater*, No. 6:09-CV-134-Orl-28KRS, 2011 WL 1233091, at *8 (M.D. Fla. Mar. 30, 2011) (turning on state severability analysis); *Women's Res. Network v. Gourley*, 305 F. Supp. 2d 1145, 1148 (E.D. Cal. 2004) (addressing a motion to invalidate 29 state statutes authorizing custom plates). Accordingly, they do not call the district court's injunction into question.

## VII.  CONCLUSION

For all of the foregoing reasons, CFF respectfully requests that this Court affirm the District Court's grant of summary judgment, as well as its order requiring the Commissioner to issue CFF's custom plate.

Respectfully submitted this 3rd day of July, 2012.

s/Jeremy D. Tedesco

| | |
|---|---|
| Jeffrey A. Shafer | Jeremy D. Tedesco |
| Alliance Defense Fund | Alliance Defense Fund |
| 801 G. Street, NW | 15100 N. 90th Street |
| Suite 509 | Scottsdale, AZ 85260 |
| Washington, DC 20001 | (480) 444-0020 |
| (202) 637-4609 | |
| | David A. Cortman |
| James P. Trainor | Alliance Defense Fund |
| Cutler, Trainor Law Firm | 1000 Hurricane Shoals Rd. |
| 2 Hemphill Place | Suite D-1100 |
| Suite 153 | Lawrenceville, GA 30043 |
| Malta, NY 12020 | (770) 339-0774 |
| (518) 899-9200 | |
| | Kevin Theriot |
| | Alliance Defense Fund |
| | 15192 Rosewood |
| | Leawood, KS 66224 |
| | (913) 685-8000 |

*Attorneys for Plaintiff-Appellee*

62

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because this brief contains 13,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 pt. font.

Dated: July 3, 2012

<u>s/Jeremy D. Tedesco</u>
Jeremy D. Tedesco
Attorney for Plaintiff-Appellee

63

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. The following participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system:

Zainab Chaudhry
New York State Office of the Attorney General
The Capitol
Albany, New York 12224
zainabchaudhry@ag.ny.gov

s/Jeremy D. Tedesco
Jeremy D. Tedesco
Alliance Defense Fund
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
Attorney for Plaintiff-Appellee

64

**ADDENDUM**

<u>Description</u>                                                                                          <u>Page</u>

New York Vehicle and Traffic Law § 404 ..................................................1

15 N.Y. Comp. Codes R. & Regs. § 16.5 ................................................3

65

Westlaw.

▷

**Effective: September 1, 2009**

Mckinney's Consolidated Laws of New York Annotated Currentness
    Vehicle and Traffic Law (Refs & Annos)
        Chapter Seventy-One. Of the Consolidated Laws (Refs & Annos)
            Title IV. Registration of Vehicles
            Article 14. Registration of Motor Vehicles
            → → **§ 404. Issuance of special number plates**

1. The commissioner may issue special number plates to applicants therefor in the same manner as other number plates are issued pursuant to this article. Such special number plates shall be issued only upon payment of an annual service charge of thirty-one dollars and twenty-five cents in addition to the regular fee prescribed by section four hundred one of this article. Application for special number plates shall be made in accordance with regulations promulgated by the commissioner with respect to issuance of such number plates. Provided, however, in lieu of the annual fee specified herein, the commissioner may establish specific categories of plates for which an annual fee of not less than eighteen dollars and seventy-five cents nor more than thirty-one dollars and twenty-five cents may be charged subject to the approval of the director of the division of the budget. Notwithstanding any inconsistent provision of this section, the difference collected between the special plates fee or service charge set forth in this subdivision in effect on and after September first, two thousand nine and the special plates fee or service charge set forth in this subdivision in effect prior to such date shall be deposited to the credit of the dedicated highway and bridge trust fund.

1-a. The commissioner may issue special number plates to applicants who are members of veterans organizations in the same manner as other number plates are issued pursuant to this article. Such special number plates shall be issued only upon (a) payment of a one-time service charge of ten dollars in addition to the regular registration fee prescribed by section four hundred one of this article, and (b) submission of proof, satisfactory to the commissioner, that the applicant is presently a member of the veterans organization for which such plate is requested. Such membership shall be verified annually by the applicant. Application for such plates shall be made in accordance with regulations promulgated by the commissioner with respect to the issuance of such plates. Provided, however, that nothing contained herein shall be deemed to supersede the provisions of section four hundred four-d, four hundred four-e, four hundred four-h, four hundred four-i, four hundred four-j, four hundred four-k or four hundred four-p of this article.

2. For purposes of this section, a special number plate shall be a plate which contains not more than eight letters, numerals or any combination thereof and which is reserved by the commissioner for issuance in accordance with the provisions of this section, or a plate reserved for issuance in a series for vehicles owned by public officers, physicians, visiting nurses, accredited representatives of the press or other groups. In issuing special number plates the commissioner shall give those applicants who held a special number plate at the time of the enactment of this section the right to retain such special number plate upon the payment of the annual service charge of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

thirty-one dollars and twenty-five cents. Provided, however, that such right of retention shall apply only to the first renewal of the registration of such special number plate following the enactment of this section. Notwithstanding any inconsistent provision of this section, the difference collected between the annual service charge set forth in this subdivision in effect on and after September first, two thousand nine and the annual service charge set forth in this subdivision in effect prior to such date shall be deposited to the credit of the dedicated highway and bridge trust fund.

3. This section shall not apply to any plates in a series reserved in the public interest for purposes of facilitating identification of state and municipal vehicles and those owned by members of international governmental organizations or any other vehicles which are exempt from the payment of registration fees, nor to plates or series of plates assigned by the commissioner for issuance by county clerks.

4. Nothing contained in this section shall be construed to require the commissioner to issue a special number plate or plates.

CREDIT(S)

(Added L.1977, c. 793, § 4. Amended L.1990, c. 158, § 1; L.1990, c. 190, § 273; L.1994, c. 170, § 194; L.1995, c. 509, § 1; L.2001, c. 415, § 1, eff. Feb. 28, 2002; L.2009, c. 59, pt. G, §§ 21, 22, eff. Sept. 1, 2009.)

Current through L.2012, chapters 1 to 24.

© 2012 Thomson Reuters

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

15 NYCRR 16.5                                                                          Page 1

N.Y. Comp. Codes R. & Regs. tit. 15, § 16.5

C

Compilation of Codes, Rules and Regulations of the State of New York Currentness
   Title 15. Department of Motor Vehicles
      Chapter I. Regulations of the Commissioner
         Subchapter B. Registration, Certificate of Title, and Number Plates
            Part 16. Special Number Plates (Refs & Annos)
               → → **Section 16.5. Restrictions**

No plate shall be issued under this Part which:

(a) does not have at least one letter. This provision shall not apply to plates issued to public officers;

(b) has numbers and letters, or any combination thereof, arranged in a format reserved for issuance to specific classes of vehicles other than passenger vehicles;

(c) is assigned for issuance to historical motor vehicles;

(d) consists of six numbers followed by one letter;

(e) is, in the discretion of the commissioner, obscene, lewd, lascivious, derogatory to a particular ethnic or other group, or patently offensive; or

(f) would lead one to believe that the owner of a particular vehicle is connected with or operating in an official capacity for a governmental organization or function.

Sec. amd. filed Oct. 11, 1965; repealed, new filed: Dec. 29, 1972; Dec. 5, 1977; amds. filed: June 29, 1979; March 6, 1984 eff. June 1, 1984.

15 NYCRR 16.5, 15 NY ADC 16.5

Current with amendments included in the New York State Register, Volume XXXIV, Issue 23, dated June 6, 2012.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Add. 3