11-5199
Rex v. Martinez

| | |
|---|---|
| 1 | UNITED STATES COURT OF APPEALS |
| 2 | FOR THE SECOND CIRCUIT |
| 3 | _____ |
| 4 | |
| 5 | August Term, 2012 |
| 6 | |
| 7 | (Argued: December 11, 2012      Decided: May 22, 2015) |
| 8 | |
| 9 | Docket No. 11-5199-cv |
| 10 | |
| 11 | _____ |
| 12 | |
| 13 | CHILDREN FIRST FOUNDATION, INC., |
| 14 | |
| 15 | *Plaintiff-Appellee,* |
| 16 | |
| 17 | v. |
| 18 | |
| 19 | BARBARA J. FIALA, in her official capacity as Commissioner |
| 20 | of the New York State Department of Motor Vehicles, |
| 21 | |
| 22 | *Defendant-Appellant.*[*] |
| 23 | |
| 24 | _____ |
| 25 | |
| 26 | Before: POOLER, HALL, and LIVINGSTON, *Circuit Judges.* |

---

[*] The Clerk of the Court is directed to amend the caption as set out above.

1   Appeal from United States District Court for the Northern District of New York
2   (Neal P. McCurn, *J.*) from its grant of a motion for summary judgment in favor of
3   Children First Foundation, Inc. ("CFF"). The Commissioner of the New York
4   Department of Motor Vehicles ("DMV") argues the district court erred in
5   concluding that the DMV violated CFF's First Amendment rights when it denied
6   CFF's application for a "Choose Life" custom license plate. We conclude that the
7   DMV's custom plate program, as applied in this case, was reasonable and
8   viewpoint neutral, and that the program did not vest the DMV commissioner
9   with unbridled discretion in approving custom plate designs. As we find no First
10  Amendment violation, the decision of the district court is reversed, and the case
11  remanded for the purpose of entering judgment in favor of the
12  defendant-appellant.
13
14  Reversed and remanded.
15
16  Judge Livingston dissents in a separate opinion.
17  _____
18
19                                JEREMY D. TEDESCO, (Jeffrey A. Shafer,
20                                David A. Cortman, James P. Trainor, Kevin
21                                Theriot, *on the brief*), Alliance Defense
22                                Fund, Scottsdale, AZ, *for Appellee.*
23
24                                ZAINAB A. CHAUDRY, (Andrea Oser, *on*
25                                *the brief*) and Eric T. Schneiderman,
26                                Attorney General of the State of New York
27                                *for* Barbara D. Underwood, Solicitor
28                                General, Albany, NY, *for*
29                                *Defendant-Appellant.*
30
31  POOLER, *Circuit Judge*:

33       A program offered by New York's Department of Motor Vehicles (the

34  "DMV" or "Department") permitted not-for-profit organizations to sponsor

1    "custom" license plates bearing a picture or logo representing their group.

2    Children First Foundation, Inc. ("CFF"), a nonprofit organization dedicated to

3    promoting adoption, applied for a custom plate that included the message

4    "Choose Life." The DMV rejected CFF's application, citing a Department policy

5    against placing controversial, politically sensitive messages on license plates,

6    which stemmed from highway safety concerns. CFF sued the DMV, and the

7    United States District Court for the Northern District of New York (Neal P.

8    McCurn, *J.*) granted CFF's motion for summary judgment, concluding that the

9    DMV violated CFF's First Amendment rights and, in the alternative, that the

10   entire program was unconstitutional on its face because it afforded the DMV

11   Commissioner unbridled discretion over which custom plates to approve. We

12   reach the opposite conclusion on both issues.

13        We conclude that the content of New York's custom license plates

14   constitutes private speech and that the plates themselves are a nonpublic forum.

15   CFF's facial challenge fails because New York's custom plate program did not

16   impermissibly vest the DMV Commissioner with unbridled discretion in

17   approving custom plate designs. Furthermore, that program, as applied in this

18   case, was reasonable and viewpoint neutral, which is all that the First

3

1    Amendment requires of restrictions on expression in a nonpublic forum. As we

2    find no First Amendment violation, the decision of the district court is reversed,

3    and the case is remanded for the purpose of entering judgment in favor of the

4    defendant-appellant.

5         Judge Livingston dissents in a separate opinion.

6                              **BACKGROUND**

7                    **I.    Factual Background**

8         From 1992 to 2004, the New York Department of Motor Vehicles ("DMV"

9    or "the Department") administered a "Take Your Pride for a Ride" program as a

10   means to raise revenue. The program permitted nonprofit organizations to apply

11   for custom license plates supporting their causes. These plates customarily depict

12   the nonprofit's logo and a mission-oriented tagline, under a "New York" banner.

13   Once approved, the custom plates were made available to motorists as an

14   alternative to the State's standard license plate design. Motorists paid a fee for

15   custom plates, and the State and the organizational sponsor shared the proceeds.

16        The DMV approved custom plates submitted by a wide range of

17   organizations. There are plates bearing the logos of sports teams, such as a World

18   Series Champions plate celebrating the New York Yankees.    Other plates

4

1    advocate particular causes, such as a "Donate Life" plate proposed by an

2    organization that promotes organ and tissue donation. Groups such as the

3    Autism Society of America, the National Multiple Sclerosis Society, and the

4    Animal Population Control Fund sponsored plates urging support for their

5    causes. Relevant to this appeal, the DMV also approved a "Union Yes" plate in

6    support of organized labor, and a "CopShot" plate, which raised funds to

7    investigate acts of gun violence against police officers. The Department also

8    permitted motorists to design and apply for vanity license plates bearing a

9    unique combination of letters and numbers. Both custom and vanity plates are

10   governed by the same regulations and DMV policies and procedures.

11        Plaintiff-Appellee Children First Foundation ("CFF") is a New York

12   nonprofit corporation that promotes adoption as an alternative to abortion. In

13   December 2001, CFF applied for a custom plate bearing its logo—a simulated

14   crayon drawing of two children's smiling faces in front of a yellow sun—and a

15   tagline that reads "Choose Life."

16        The DMV Commissioner at the time, Richard Martinez, denied the

17   application in a letter dated February 25, 2002.   In the letter, Martinez noted that

18   one of his predecessors, Richard Jackson, had denied a similar application from a

1    different organization in 1998, and that, after reviewing Jackson's analysis of the

2    issue, the DMV decided to again reject the "Choose Life" specialty plate request.

3    The letter did not enclose the 1998 ruling nor explain the basis for the prior denial.

4    Jackson's 1998 denial letter, which is part of the record on appeal, explained that it

5    was the State's "policy not to promote or display politically sensitive messages"

6    on its license plates, and that the Department's "concern is that a plate advocating

7    politically sensitive and emotionally charged issues" may lead to incidents of

8    road rage. App'x at 406.

9         CFF's counsel wrote a letter to the Department dated March 22, 2002,

10   requesting a detailed explanation of the Department's decision. CFF's counsel

11   sent a second letter, dated May 8, 2002, claiming that the DMV's denial

12   constituted viewpoint discrimination in violation of the First Amendment and

13   was a prior restraint on CFF's speech.

14        By letter dated June 10, 2002, the Department's Deputy Commissioner and

15   Counsel Jill Dunn responded to CFF's letters. Dunn cited 15 N.Y.C.R.R. § 16.5(e),

16   which states that "no plate shall be issued under this part which is, in the

17   discretion of the commissioner, obscene, lewd, lascivious, derogatory to a

18   particular ethnic or other group, or patently offensive." J.A. 440. Dunn explained,

6

1    "despite [CFF's] laudable goals and purposes, the message chosen to convey

2    them, as indicated in the application, is subject to varying interpretations at best,

3    and may even be misleading." App'x at 441. Dunn also stated that the

4    Department believed "the phrase 'Choose Life' is more commonly associated

5    with the abortion rights debate than it is with the promotion and funding of

6    adoption," and thus the issuance of such a plate "would readily be perceived as

7    governmental support for one side of a controversy that has existed in this

8    country for several decades." App'x at 441.

9        Dunn raised a public safety concern, citing "the violence which has erupted

10   outside medical facilities in New York and elsewhere," and concluding, "a

11   significant segment of the population [would find] such plates to be patently

12   offensive." App'x at 441. Dunn also stated that the Department's decision was

13   "intended to preserve viewpoint neutrality by insuring [*sic*] that plates issued by

14   the State do not present or support <u>either</u> side of this issue, or any other political,

15   religious, or social issue that has proven to be so contentious and divisive." App'x

16   at 441 (emphasis in the original). Dunn noted that while the Department "cannot

17   control the placement of bumper stickers," it "will not place an instrumentality

18   on public roadways which may engender violent discourse among drivers," and

7

1    that such actions would be counter to the DMV's "very mission [] to promote

2    traffic safety for the protection of the general public." App'x at 441. In closing,

3    Dunn explained that the Department would give "all due consideration" to "an

4    application to display a message that is both directly related to [CFF's] own

5    mission and unrelated to the controversial issues" cited therein. App'x at 441.

6         In October 2003, CFF submitted a redesigned plate for the Department's

7    consideration. CFF shrank the words "Choose Life" and shifted them from the

8    tagline position at the bottom of the plate to a less prominent position underneath

9    the logo. The new tagline read "FUND-ADOPTION.ORG." App'x at 314.   CFF

10    stated that the new tagline better reflected its purpose, but that a "Support

11    Adoption" or "Choose Adoption" plate would not sell as well as a plate

12    containing the words "Choose Life," which it maintained must remain on the

13    plate for marketing purposes. App'x at 308. CFF explained that "'Choose Life'

14    appeals to a much wider audience that encompasses not only pro-adoption, but

15    also [anti-abortion] and anti-death penalty supporters as well." App'x at 329.

16         Commissioner Martinez rejected the revised application in a letter dated

17    March 31, 2004.   He explained that CFF's revisions failed to address the

18    fundamental concerns that led the DMV to deny CFF's prior application.

8

1    Martinez conveyed his belief that in its second application, CFF had

2    "acknowledge[d] that the phrase 'Choose Life' rather than 'Choose Adoption' or

3    'Support Adoption' is more appealing to your organization *specifically* because it

4    appeals to pro-life and anti-death penalty supporters," and further stated:

5              I have little choice but to interpret this as an
6              acknowledgment that the proposed plate design is, in
7              fact, intended to draw attention to the very political,
8              social and religious issues that were addressed in
9              Deputy Commissioner Dunn's June 2002 letter. Based
10             on the acts of violence and death that have surrounded
11             the abortion debate, I simply will not voluntarily put an
12             instrumentality on our public roadways that will incite
13             the type of anger and outrage as we have seen outside
14             abortion clinics in New York State and elsewhere.
15
16   App'x at 438. Martinez also suggested that CFF petition the Legislature to

17   approve its custom plate.

18         Instead of petitioning the Legislature, however, CFF submitted a third

19   application in July 2004 after unsuccessfully urging then-Governor Pataki to

20   direct the Department to issue the Choose Life plate.   The third design included

21   "Choose Life" and the logo, but proposed a tagline of

22   "SafeHavens-Adoption.org" or "NYChoose-Life.org." App'x at 461, 463.   In

23   August 2004, Commissioner Martinez suspended the custom plate program in

9

1   order to review and update "the criteria and standards for considering

2   applications" for new custom plates "through the formal regulatory process."

3   App'x at 478. Dunn notified CFF of the moratorium and stated in a letter that

4   despite CFF's third application, the original decision remained unchanged, and

5   that "there is no application currently pending which is ripe for consideration."

6   App'x at 478. The moratorium on new custom plate applications still stands, but

7   the DMV continues to issue custom plates that were approved prior to the

8   moratorium.

9            **II.      Procedural Background**

10           In August 2004, CFF commenced the present action against the

11   Department,[1]  pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive

12   relief as well as monetary damages. CFF alleged that the DMV's denial of its

13   custom plate applications violated its free speech rights under the First

14   Amendment. CFF also alleged due process and equal protection violations under

15   the Fourteenth Amendment.

---

1 Although the current DMV Commissioner, Barbara J. Fiala, is the named appellant, we refer to
the DMV as the Defendant-Appellant, both for ease of reference and because Fiala is only named
in her official capacity.

10

1    The parties filed cross motions for summary judgment. In its decision on

2    those motions, the district court first concluded: (1) that the speech at issue is

3    private, as opposed to government, speech; and (2) that the custom plates

4    constituted a nonpublic forum. The court granted CFF's motion on three separate

5    grounds: (1) the Commissioner's alleged "exclusion of the entire subject of

6    abortion from the forum is not permissible content-based discrimination but is

7    discrimination based on viewpoint;" (2) the "denial of CFF's plate application

8    was unreasonable" based on "the purpose of New York's custom plate forum,"

9    which is to disseminate a variety of private affiliations; and (3) the DMV's

10   regulations and practices granted the Commissioner "unbridled discretion" to

11   approve or deny applications for custom plates. *Children First Found., Inc. v.*

12   *Martinez*, 829 F. Supp. 2d 47 (N.D.N.Y. 2011). Because CFF prevailed on its First

13   Amendment claims, the district court did not address its due process and equal

14   protection claims. The court ordered the Commissioner to approve CFF's custom

15   plate application, but stayed execution of the judgment until resolution of the

16   anticipated appeal.

17   The Department appealed, challenging all of the district court's adverse

18   conclusions pertaining to CFF's First Amendment claims.

11

1      **DISCUSSION**

2      "We review *de novo* a district court's grant of summary judgment." *Byrne v.*

3   *Rutledge*, 623 F.3d 46, 52 (2d Cir. 2010). We "will affirm only if, construing the

4   evidence in the light most favorable to the nonmoving party, 'there is no genuine

5   dispute as to any material fact and the movant is entitled to judgment as a matter

6   of law.'" *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 132 (2d Cir.

7   2013) (quoting Fed. R. Civ. P. 56(a)). When faced with cross motions for

8   summary judgment we "evaluate each party's motion on its own merits, taking

9   care in each instance to draw all reasonable inferences against the party whose

10  motion is under consideration." *Byrne*, 623 F.3d at 53 (internal quotation marks

11  omitted).

12      The primary issues before us are: (1) whether the DMV's custom license

13  plate program is facially invalid as a prior restraint on speech because it does not

14  sufficiently constrain the Commissioner's ability to exercise unbridled discretion;

15  and (2) if the program is facially valid, whether the DMV violated CFF's First

16  Amendment rights when it rejected CFF's custom plate applications. In order to

17  reach these issues, first we must determine whether the messages on the custom

12

1    plates constitute government or private speech. We must then determine what

2    type of forum the custom plate program created.

3    **I.    First Amendment Claims**

4         **A. Government Speech or Private Speech**

5         "The Free Speech Clause restricts government regulation of private speech;

6    it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555

7    U.S. 460, 467 (2009). The threshold question presented for our review is thus

8    "whether the messages on specialty license plates are government speech, private

9    speech, or a combination of the two." *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 860

10   (7th Cir. 2008). If we conclude that those messages are anything but private

11   speech, our First Amendment analysis ends, "because there has been no First

12   Amendment violation—in fact, the First Amendment would not even apply."

13   *Texas Div., Sons of Confederate Veterans, Inc. v. Vandergriff*, 759 F.3d 388, 393 (5th Cir.

14   2014) *cert. granted sub nom. Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,

15   135 S. Ct. 752 (2014).

16        The Supreme Court has not yet articulated a test to distinguish government

17   speech from private speech, although the issue is currently pending before the

18   Court. *See id.* Nor has our Court constructed such a test, but we do have the

13

1    benefit of persuasive authority from our sister circuits to guide our inquiry. We

2    find the Fifth Circuit's analysis in *Vandergriff* –a case that also pertains to specialty

3    license plates—to be particularly helpful, and its test formulation convincing.

4    The *Vandergriff* court looked to the two Supreme Court cases that are most on

5    point, *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), and *Summum*, 555

6    U.S. at 467–68, and concluded: "Considering the emphasis on context and the

7    public's perception of the speaker's identity in *Summum*, we think the proper

8    inquiry here is 'whether a reasonable and fully informed observer would

9    understand the expression to be government speech, as distinct from private

10   speech the government chooses to oblige.'" *Vandergriff*, 759 F.3d at 394 (quoting

11   *Summum*, 555 U.S. at 487).   This is apt distillation of the Supreme Court's

12   jurisprudence on this question.

13          Applying this test to the specialty license plates at issue here, we have little

14   difficulty concluding that such an observer would know that motorists

15   affirmatively request specialty plates and choose to display those plates on their

16   vehicles, which constitute private property. *See Wooley v. Maynard*, 430 U.S. 705,

17   713 (1977) (characterizing cars as "private property"). The connection between the

18   message displayed by the specialty plate and the driver who selects and displays

14

1    it is far stronger than the connection between the message and the Department's

2    stamp of approval. We thus join the Fourth, Fifth, Seventh, Eighth, and Ninth

3    Circuits, which have held that messages on specialty license plates are private

4    speech. *See Vandergriff*, 759 F.3d at 396 (5th Cir. 2014) (holding "that specialty

5    license plates are private speech"); *Roach v. Stouffer*, 560 F.3d 860, 867 (8th Cir.

6    2009) (concluding that specialty plates are private speech); *Choose Life*, 547 F.3d at

7    863 (7th Cir. 2008) ("Messages on specialty license plates cannot be characterized

8    as the government's speech."); *Ariz. Life Coal., Inc. v. Stanton*, 515 F.3d 956, 968 (9th

9    Cir. 2008) ("Messages on specialty license plates in Arizona are private speech);

10   *Sons of Confederate Veterans, Inc. v. Comm'n of Virginia Dep't of Motor Vehicles*, 288

11   F.3d 610, 621 (4th Cir. 2002) (messages on Virginia specialty license plates are

12   private speech); *but see Am. Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370,

13   376 (6th Cir. 2006) ("Choose Life" message on Tennessee specialty license plate is

14   government speech).

15         Our conclusion is consistent with our opinions in *Perry v. McDonald*, 280

16   F.3d 159 (2d Cir. 2001) and *Byrne v. Rutledge*, 623 F.3d 46 (2d Cir. 2010).   In those

17   cases, the court did not address whether the messages on vanity plates

18   constituted government speech or private speech but instead proceeded directly

15

1    to the forum analysis. Since a forum analysis is only undertaken once speech is

2    deemed to be private, however, *see Summum*, 555 U.S. at 469 (stating that

3    government speech is not restricted by the Free Speech Clause), these cases are

4    reasonably to be interpreted as implying that the messages on specialty plates

5    constitute private speech.

6         We conclude that custom license plates display private speech, and that

7    the messages they convey are thus subject to First Amendment protection.

8    Accordingly, we proceed to determine the type of forum the Department

9    established through its custom license plate program.

10    **B.  Forum Analysis**

11         Even though the writing on license plates constitutes private speech, the

12    plates themselves remain government property, and "[i]t is well established that

13    the government need not permit all forms of speech on property that it owns and

14    controls." *Perry*, 280 F.3d at 166. Because "'the government is permitted to

15    exercise control over the public's use of government-owned property for

16    expressive purposes, and the degree of control permitted depends upon the

17    nature of the property and the speech restrictions imposed thereon,'" we must

18    first consider the nature of the government property, or forum, at issue. *Zalaski v.*

16

1    *City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (quoting *Hotel*

2    *Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks &*

3    *Recreation*, 311 F.3d 534, 544 (2d Cir. 2002)).

4            In reviewing an alleged unconstitutional restriction on speech, we have

5    recognized that "[t]he level of scrutiny applied . . . depends upon the nature of

6    the forum in which the speech occurs." *R.O. ex rel. Ochshorn v. Ithaca City Sch.*

7    *Dist.*, 645 F.3d 533, 539 (2d Cir. 2011). We have traditionally recognized three

8    categories of government property: (1) the traditional public forum; (2) the

9    designated public forum; and (3) the nonpublic forum. *Byrne*, 623 F.3d at 53

10   (citing *Perez v. Hoblock*, 368 F.3d 166, 172-73 (2d Cir. 2004)). More recently, we

11   recognized a fourth category: the limited public forum, which is "a subset of the

12   designated public forum." *Hotel Employees*, 311 F.3d at 545.

13           A traditional public forum is government property that "by long tradition

14   or by government fiat . . . ha[s] been devoted to assembly and debate," such as a

15   public street or square. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37,

16   45 (1983). Restrictions on speech in a public forum are subject to strict scrutiny,

17   and thus will be upheld only when the restriction is both "necessary to serve a

17

1   compelling state interest," and "narrowly drawn to achieve that interest."

2   *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

3          A designated public forum is created when the government "intentionally

4   open[s] a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802.

5   "Although a state is not required to indefinitely retain the open character of the

6   facility, as long as it does so it is bound by the same standards as apply in a

7   traditional public forum." *Perry Educ. Ass'n*, 460 U.S. at 46. Thus, restrictions on

8   speech in designated public forums must also survive strict scrutiny. *Cornelius*,

9   473 U.S. at 800.

10         The government creates a limited public forum when it "opens a

11  non-public forum but limits the expressive activity to certain kinds of speakers or

12  to the discussion of certain subjects." *R.O. ex rel. Ochshorn*, 645 F.3d at 539

13  (internal quotation marks and emphasis omitted). In a limited public forum,

14  "strict scrutiny is accorded only to restrictions on speech that falls within the

15  designated category for which the forum has been opened." *Hotel Employees*, 311

16  F.3d at 545. Restrictions that fall outside of that category "need only be viewpoint

17  neutral and reasonable." *Id.* at 546.   Finally, a nonpublic forum is government

18  "property that is not traditionally open to the public and that the government

18

1  has not opened for expressive activity by members of the public." *Byrne*, 623 F.3d

2  at 53. A restriction on speech in a nonpublic forum must only be reasonable and

3  viewpoint-neutral. Our forum determination thus hinges "on the government's

4  intended purpose for the property." *N.Y. Magazine v. Metro. Transp. Auth.*, 136

5  F.3d 123, 129 (2d Cir. 1998).

6  The district court identified New York's custom plates as either a limited

7  public forum or a nonpublic forum but did not decide between the two because,

8  in either situation, the applicable test would require the program to be reasonable

9  and viewpoint neutral. On appeal, the DMV argues that the custom license plates

10  constitute a nonpublic forum. CFF counters that the plates constitute a designated

11  public forum, or a limited public forum in which strict scrutiny should be applied

12  in this instance. CFF argues in the alternative that the DMV's denial of its

13  application was neither reasonable nor viewpoint neutral.

14  This court has twice found government-issued specialty license plates to

15  be a nonpublic forum—albeit the plates in those instances were vanity license

16  plates, as opposed to custom license plates. *See Byrne*, 623 F.3d at 53–54; *Perry*,

17  280 F.3d at 167. In *Perry*, the state of Vermont revoked an individual vanity plate

18  that read "SHTHPNS," an abbreviation for "Shit Happens." *Perry*, 280 F.3d at

19

1   163, 167. The *Perry* court concluded that the Vermont's vanity plates created a

2   nonpublic forum and provided several factors that informed our decision. For

3   one, the regulations regarding vanity plates were so restrictive that the

4   constrained speech was not indicative of a designated forum. *Id.* at 167–68. The

5   court also considered that the stated purpose of issuing license plates was vehicle

6   identification rather than public discourse. *Id.* at 167. The court further noted that

7   the program was designed to raise revenue, so that the minimal allowance of

8   speech did not demonstrate the government's intention to create a designated

9   forum. *Id*. The fact that the general public did not have unrestricted access to the

10  plates further evinced the lack of government intent to create a public forum. *Id.*

11  at 168. Finally, the court considered the nature of license plates as being a

12  restricted forum for open discourse. *Id*. at 168–69.

13          Similarly, in *Byrne*, the State of Vermont denied the plaintiff's request for a

14  vanity plate that read "JN36TN" in reference to "the often-quoted Biblical verse,

15  John 3:16," because of a state law banning "all vanity plate combinations that

16  'refer, in any language, to a . . . religion' or 'deity.'" *Byrne*, 623 F.3d at 49 (quoting

17  Vt. Stat. Ann. Tit. 23, § 304(d)(1), (3)(A)). Applying the same line of reasoning as

20

1    *Perry*, this court again concluded that motor vehicle license plates constitute a

2    nonpublic forum. *Id.* at 54.

3        By way of comparison, in *New York Magazine v. Metropolitan Transit*

4    *Authority*, this court held that "the advertising space on the outside of MTA

5    buses is a designated public forum, because the MTA accepts both political and

6    commercial advertising." *N.Y. Magazine*, 136 F.3d at 130. The court determined

7    that New York City's intent was to invite discourse in a designated forum,

8    because the City allowed advertisements containing "political speech" and

9    "clashes of opinion and controversy" on MTA buses. *Id.*

10       Turning to the forum in this case, we conclude that there is no material

11    difference between Vermont's vanity plate program and New York's custom

12    plate program—or between the nature of custom and vanity plates

13    generally—that permits us to diverge from *Perry* and *Byrne*. The DMV has not

14    given the general public open access to the custom plate program. *See Perry Educ.*

15    *Ass'n*, 460 U.S. at 47 (stating that a designated public forum exists where

16    government permits "indiscriminate use by the general public"). Quite the

17    contrary: the DMV maintains discretion to limit speech on custom license plates

18    through the application process. *Cf. Perry*, 280 F.3d at 168 (stating that "the

21

1    general public does not have unimpeded access to Vermont license plates" and

2    that the requirement for obtaining permission was evidence that Vermont did

3    not intend to create a public forum).

4        Furthermore, New York established this forum not to create discourse, but

5    to raise revenue. Unlike the advertising scheme in *New York Magazine*, New

6    York's custom license plate program does not invite "clashes of opinion and

7    controversy." 136 F.3d at 130. Instead, the DMV did precisely the opposite by

8    consistently excluding controversial political speech from the custom plate

9    program. The DMV regulated speech on custom plates in order to advance the

10   Department's overarching mission of public safety. These actions indicate that

11   the forum was intended to allow for limited speech in order to raise money, not

12   to invite debate.

13       Finally, as this court and others have held, the very nature of license plates

14   precludes us from concluding that the program creates a public forum of any

15   stripe. *See Perry*, 280 F.3d at 168 ("The very character of license plates [] suggests

16   that they are not a designated public forum."). As the Seventh Circuit has noted,

17   "[l]icense plates are not by nature compatible with anything more than an

18   extremely limited amount of expressive activity." *Choose Life Ill.*, 547 F.3d at 865.

1    By their very nature, license plates are not designed for open discourse or the

2    open exchange of ideas but rather to identify vehicles, facilitate traffic safety, and

3    in the case of specialty plates, to raise revenue.

4            Against the backdrop of *Perry* and *Byrne*, we readily conclude that New

5    York's custom license plate program created a nonpublic forum, and thus, that

6    the Department's rejection of CFF's proposed plate must only be reasonable and

7    viewpoint neutral.

8            We next turn to CFF's facial and as-applied First Amendment challenges.

9    We begin with the facial challenge, because if New York's custom license plate

10   regime is facially invalid, there will be no reason to reach the as-applied

11   challenge, whereas the opposite is not true.[2]

---

2       The Supreme Court has held that when it comes to freedom of expression, a regulation "may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992). "This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Id.* As a result, "the Court has permitted a party to challenge an ordinance . . . in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker." *Id.* at 129-30. We believe that a facial challenge based on the unbridled discretion doctrine unquestionably falls into this category. Moreover, because the harm that the doctrine combats is the inability of as-applied challenges effectively to detect and remedy potential acts of unconstitutional viewpoint discrimination, *see infra* Section C, it makes little sense to tackle an as-applied challenge prior to testing for unbridled discretion. *See e.g.*, *Matwyuk v. Johnson*, 22 F. Supp. 3d 812 (W.D. Mich. 2014) (resolving a facial challenge claiming unbridled

1      **C. Facial Challenge and Unbridled Discretion.**

2      CFF argues that the Department's custom plate program violates the First

3   Amendment because it affords the Commissioner unbridled discretion with

4   respect to which applications to approve and which to reject.    Our dissenting

5   colleague agrees, but we do not.

6      As the Supreme Court explained, "in the area of free expression a licensing

7   statute placing unbridled discretion in the hands of a government official or

8   agency constitutes a prior restraint and may result in censorship." *City of*

9   *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). Unbridled discretion

10  is inconsistent with the First Amendment because "it allows officials to suppress

11  viewpoints in surreptitious ways that are difficult to detect." *Amidon v. Student*

12  *Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 103 (2d Cir. 2007). In order to

13  survive a First Amendment challenge based on a claim of unbridled discretion, a

14  regime that subjects speech to a prior restraint, such as New York's custom plate

15  program, "must, as a prophylactic matter, contain 'narrow, objective, and

16  definite standards to guide the licensing authority.'" *Id.* (quoting *Forsyth Cnty.,*

17  *Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)).

---

discretion before resolving an as applied challenge).

1    Before proceeding further, we note that throughout the lifespan of this

2    case, CFF's unbridled discretion argument has taken a back seat to its as-applied

3    challenge. Perhaps as a result, neither the parties nor the district court have

4    clearly isolated it as a separate, facial challenge to a prior restraint, nor analyzed

5    it in that context. The distinction is significant, however, and we take this

6    opportunity to frame the issue more clearly and completely.

7    The unbridled discretion doctrine is inextricably linked to its function as a

8    facial challenge because the "risks to free expression" that it is designed to

9    prevent "can be effectively alleviated only through a facial challenge." *Lakewood*,

10   486 U.S. at 757. The first of two such risks is the potential for self-censorship that

11   arises where "the mere existence of the licensor's unfettered discretion [is]

12   coupled with the power of prior restraint." *Id.* "Self-censorship is immune to an

13   'as applied' challenge, for it derives from the individual's own action, not an

14   abuse of government power." *Id.* Thus, "only a facial challenge can effectively

15   test" for the standards required to limit the administrator's discretion. *Id.* at 758.

16   The second risk that the doctrine combats is "the difficulty of effectively

17   detecting, reviewing, and correcting content-based censorship 'as applied'

18   without standards by which to measure the licensor's action." *Id.* at 759; *see also*

25

1   *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1320 (Fed. Cir. 2002) ("[T]he

2   absence of express standards . . . makes it difficult to prove illicit discrimination

3   in an as-applied challenge. Given the burden of challenging the licensor's actions

4   case-by-case, these barriers to as-applied challenges may render the licensor's

5   decisions unreviewable unless facial challenges are allowed."). We therefore

6   clarify that, consistent with every prior application of the unbridled discretion

7   doctrine of which we are aware, CFF's challenge to New York's custom license

8   plate program is properly construed as a facial challenge to a prior restraint. *See,*

9   *e.g.*, *Lakewood*, 486 U.S. 750; *Forsyth,* 505 U.S. 123; *Byrne*, 623 F.3d 46; *Roach*, 560

10  F.3d 860; *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299 (Fed. Cir. 2008);

11  *Amidon*, 508 F.3d 94; *Griffin*, 288 F.3d 1309; *Perry*, 280 F.3d 159.

12      A plaintiff raising a facial challenge shoulders a "heavy burden." *Amidon*,

13  508 F.3d at 98 (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580

14  (1998)). "Facial invalidation is, manifestly, strong medicine, that [is to be

15  employed] sparingly and only as a last resort." *Finley*, 524 U.S. at 580 (internal

16  quotation omitted). To prevail, a plaintiff "'must demonstrate a substantial risk'

17  that application of the challenged practice or provision will lead to a First

18  Amendment violation." *Amidon*, 508 F.3d at 98 (quoting *Finley*, 524 U.S. at 580);

26

1    *see also Griffin*, 288 F.3d at 1321 ("[I]n order to consider his facial challenge,

2    [plaintiff] must still show a realistic possibility that application of [the regulation

3    that he challenges] will suppress a substantial amount of constitutionally

4    protected speech.").

5           As a threshold issue, we must determine whether the unbridled discretion

6    doctrine applies in the context of nonpublic forums. Although the Supreme

7    Court offers no explicit guidance on this subject, it is plain that the answer is

8    "yes." The dangers posed by unbridled discretion are as present in nonpublic

9    forums as they are in the traditional public forums, where the doctrine has most

10   commonly been deployed. *Child Evangelism Fellowship of MD, Inc. v. Montgomery*

11   *Cnty. Pub. Sch.*, 457 F.3d 376, 386–87 (4th Cir. 2006). Furthermore, we see no

12   reason why a doctrine that is designed largely to target "undetectable viewpoint

13   discrimination," *Amidon*, 508 F.3d at 103, should not apply in nonpublic forums,

14   where restrictions must be viewpoint neutral. In *Perry*, our Court implicitly

15   reached such a conclusion by applying the unbridled discretion doctrine to

16   Vermont's vanity plate program, which it had previously deemed a nonpublic

17   forum. 280 F.3d at 169–73.

27

1    We thus join our sister circuits that have, over time, been coalescing

2    around the conclusion that the unbridled discretion doctrine applies in the

3    context of nonpublic forums. *See Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir.

4    2012); *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062,

5    1069 (4th Cir. 2006); *Griffin*, 288 F.3d at 1197–1200; *Southworth v. Bd. of Regents of*

6    *Univ. of Wis. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002); *Sentinel Communications Co. v.*

7    *Watts*, 936 F.2d 1189 (11th Cir. 1991).

8    To avoid an official exercising unbridled discretion in the context of a prior

9    restraint there must be "adequate standards to guide the official's decision." *Field*

10   *Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 176 (2d Cir. 2006) (quoting *Thomas v.*

11   *Chicago Park Dist.*, 534 U.S. 316, 323 (2002)). We do not, however, require "perfect

12   clarity and precise guidance" from such standards. *Ward v. Rock Against Racism*,

13   491 U.S. 781, 794 (1989); *see also Field Day*, 463 F.3d at 179. Additionally, "when a

14   state law has been authoritatively construed so as to render it constitutional, or a

15   well-understood and uniformly applied practice has developed that has virtually

16   the force of a judicial construction, the state law is read in light of those limits.

17   That rule applies even if the face of the statute might not otherwise suggest the

18   limits imposed." *Lakewood*, 486 U.S. at 770 n.11 (citing *Poulos v. New Hampshire*,

28

1  345 U.S. 395 (1953)). We "presume any narrowing construction or practice to

2  which the law is fairly susceptible." *Id.* (citing *Erznoznik v. City of Jacksonville*, 422

3  U.S. 205 (1975)); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 795–96

4  ("Administrative interpretation and implementation of a regulation are, of

5  course, highly relevant to our analysis, for in evaluating a facial challenge to a

6  state law, a federal court must consider any limiting construction that a[n]

7  enforcement agency has proffered." (internal quotation marks and alterations

8  omitted)). Finally, when, as in this instance, a nonpublic forum is involved,

9  "greater latitude ought to be accorded to government officials," as "[s]electivity

10  and discretion are some of the defining characteristics of the nonpublic forum."

11  *Griffin*, 288 F.3d at 1323. "[T]he fact that discretionary access is a defining

12  characteristic of the nonpublic forum should suggest that more official discretion

13  is permissible in a nonpublic forum than would be acceptable in a public forum."

14  *Id.* at 1324. We now turn to the challenge before us.

15      New York's custom plate program was established under the authority

16  vested in the DMV Commissioner by N.Y. Veh. & Traf. Law § 404, which

17  empowers—but expressly does not require—the Commissioner to issue specialty

18  plates in accordance with regulations the Commissioner promulgates. Pursuant

29

1    to § 404, the DMV promulgated 15 N.Y.C.R.R. § 16.5(e), which states that no plate

2    shall be issued that "is, in the discretion of the commissioner, obscene, lewd,

3    lascivious, derogatory to a particular ethnic or other group, or patently

4    offensive." We agree with CFF and our dissenting colleague that these two

5    provisions afford the commissioner broad discretion. Commissioner Martinez

6    even admitted as much. The ability of these two provisions—standing alone—to

7    provide an adequate safeguard against the Commissioner's exercise of unbridled

8    authority is dubious. Our universe, however, is not so narrowly drawn. We must

9    also look to any pertinent agency policies and practices, written or unwritten, as

10   long as they are well-established and "uniformly enforced." *See Griffin*, 288 F.3d

11   at 1326 (presuming any "narrowing construction or practice to which the

12   [program] is fairly susceptible"); *Lakewood*, 486 U.S. at 770 n.11 (citing *Erznoznik*,

13   422 U.S. 205).

14         In a 1998 letter denying a different party's application for a "Choose Life"

15   custom plate, the Commissioner at the time, Richard Jackson, provided the

16   following explanation:

17                It is the State of New York's policy not to promote or
18                display politically sensitive messages on our license
19                plates. You may have heard and read a great deal lately

30

1                about the subject of "road rage." Increasingly, even
2                simple gestures and small discourtesies on highways
3                have led to serious incidents between drivers and even
4                fatal accidents and criminal charges.

5

6                Our concern is that a plate advocating politically
7                sensitive and emotionally charged issues may lead to
8                further incidence of aggressive driving or worse.
9                Therefore, we have no plans to offer any plate which
10              has the possibility of compromising the safety of
11              anyone driving on New York highways.

12

13  App'x at 406. Jackson testified in this case that he indeed adhered to the policy

14  that anything advocating either side of a political position would be rejected.

15  Throughout the period of correspondence between DMV officials and CFF's

16  attorney, which began four years after the DMV denied the identical but

17  unrelated application for a "Choose Life" plate, the DMV maintained its position

18  that it would not issue the plate due to a concern over violent reactions, and that

19  it would not issue a plate supporting either side of this issue "or any other

20  political, religious or social issue that has proven to be so contentious and

21  divisive." App'x at 409; *see also* App'x at 438–39. Commissioner Martinez and

22  other DMV officials involved in the custom plate program also testified that

23  pursuant to the Department's policy, custom plates espousing a particular

31

1    political position were not approved due to concerns over road rage. We

2    conclude, therefore, that this policy was sufficiently "well established."

3         Our inquiry does not end there, however, because in order to pass

4    constitutional muster the Department's policy must also be "uniformly applied."

5    The Department evaluated numerous applications, for both custom and vanity

6    plates, and had previously denied plate requests on the basis of its policy. For

7    example, the DMV denied an application for a "Restore the Wolf" custom license

8    plate at a time when the topic was the subject of heated debate in the

9    Adirondacks. Speaking to the media, a DMV spokesman stated that this was "the

10   first time a group has requested a specialty plate focusing on a political issue."

11   App'x at 1664.   In that instance, "the State found the proposed plate could be

12   interpreted as a governmental endorsement for one side of a highly-charged

13   controversy surrounding the reintroduction of this animal to upstate New York,"

14   and based its denial on that real concern. App'x at 1664–65. Similarly, the DMV

15   denied a request for a vanity plate reading "RU486," a reference to the

16   "morning-after pill," in order to avoid the appearance of government

17   endorsement of a pro-choice stance in the abortion debate. App'x at 1458–59. The

32

1    Department also applied this policy when it denied the 1998 application for the

2    "Choose Life" custom plate.

3         CFF focuses not on the instances when plate proposals were rejected but

4    rather on instances when the DMV approved certain plates, which CFF claims

5    espouse messages on similarly controversial political topics. Specifically, CFF

6    points to plates that read "Cop Shot," and "Union Yes."[12] But the issue of

7    bringing to justice individuals who have attacked police officers cannot

8    reasonably compare—either by its very nature or by the level of contentiousness

9    that surrounds it—to the issue of abortion. With respect to the decision to issue a

10   "Union Yes" plate, while the myriad issues pertaining to organized labor in the

11   United States are social and political in nature, there is no basis to conclude that

12   the Department failed to apply the policy against creating plates that touch upon

13   contentious political issues as opposed to having applied the policy and merely

14   reaching a different result than it did with the "Choose Life" plate. It is not our

---

[12] CFF also argues that there is no clear distinction between the "Choose Life" plate and a "War on Terror Veteran" plate to justify the DMV's rejection of the former and acceptance of the latter. Such a comparison fails, however, since the "War on Terror Veteran" plate was created through a legislative action, and not through the DMV's custom plate program. *See* N.Y. Veh. & Traf. Law § 404-w.

33

1    place to evaluate and weigh the various hot button issues of our time against one

2    another, assigning to each a specific place in the landscape of public debate in

3    this country. The DMV's policy does require interpretation and line drawing as

4    to which subjects to exclude entirely, but that does not undermine the policy's

5    potency as a safeguard against the Commissioner's exercise of unbridled

6    discretion. Put another way, some discretion—particularly in a nonpublic forum,

7    where "[s]electivity and discretion are some of the defining characteristics" of the

8    forum, *Griffin*, 288 F.3d at 1323—does not constitute unbridled discretion. After

9    all, "perfect clarity and precise guidance" are not required. *Amidon*, 508 F.3d at

10   103 (citation omitted); *see also Ward*, 491 U.S. at 794 ("While these standards are

11   undoubtedly flexible, and the officials implementing them will exercise

12   considerable discretion, perfect clarity and precise guidance have never been

13   required even of regulations that restrict expressive activity."); *Thomas*, 534 U.S.

14   at 325 (concluding that the potential abuse of a waiver program "must be dealt

15   with if and when a pattern of unlawful favoritism appears, rather than by

16   insisting upon a degree of rigidity that is found in few legal arrangements"). The

17   commissioner's approval of the "Union Yes" plate does not indicate inconsistent

18   application of the DMV's policy.

34

1    Finally, we are not troubled by the scant number of times the DMV

2    rejected a custom plate application based on its policy of avoiding contentious

3    political issues altogether, nor do we believe that a larger sample size is required

4    for us to determine that the policy was both well-established and consistently

5    applied. Indeed, the dearth of rejections is far more consistent with a regime that,

6    on the whole, promotes rather than constricts free speech, as opposed to a regime

7    that poses the type of "substantial risk" of impermissibly curtailing free speech

8    for which facial invalidation is reserved. *See Amidon*, 508 F.3d at 98.

9    We conclude that the DMV's policy of excluding completely controversial

10   political and social issues—regardless of the particular viewpoint

11   espoused—from the nonpublic forum of custom license plates, based on

12   concerns pertaining to potential violence and the perception of state

13   endorsement of the message, is sufficiently well-established and has been

14   uniformly enforced so as to render the Commissioner's discretion adequately

15   bridled.

16   We are convinced not only by the policy itself but also by the procedures

17   by which the DMV effectuates that policy. In determining what is "politically

18   sensitive" and "emotionally charged," the Department's established practice calls

35

1    for the Commissioner to confer with the "Executive Deputy Commissioner, the

2    Deputy Commissioner and members of [the] legal staff." App'x at 1457–59.

3    Although this is a facial challenge and is thus "not dependent on the facts

4    surrounding any particular permit decision," *Forsyth*, 505 U.S. at 133 n.10, we

5    find the procedures used by the DMV after it had engaged in internal

6    deliberations to be particularly revealing. Specifically, the DMV explained its

7    decision in detail, and it suggested changes that CFF could make to its proposed

8    plate design which would allow the plate to be approved. In *Forsyth*, the

9    Supreme Court concluded that a county administrator had unbridled discretion

10   based in part on the facts that the administrator was not required to "provide

11   any explanation for his decision" and his decisions were "unreviewable." 505

12   U.S. at 133. The DMV's process is not a black box. We construe this level of

13   transparency and communication with the applicant as a narrowing construction

14   and part of the overall custom plate program.

15        To grasp the significance of the DMV's "rejection process," we return to

16   the rationales underlying the unbridled discretion doctrine and the reasons why

17   the Supreme Court determined that the First Amendment requires recognition of

18   this particular brand of facial challenge. The "identifiable risks to free

36

1    expression" posed by unbridled discretion are two-fold: (1) "the mere existence

2    of the licensor's unfettered discretion, coupled with the power of prior restraint,

3    intimidates parties into censoring their own speech, even if the discretion and

4    power are never actually abused," and, as relevant to the DMV's rejection

5    process, (2) without sufficient "guideposts that check the licensor . . . *post hoc*

6    rationalizations by the licensing official and the use of shifting or illegitimate

7    criteria are far too easy, making it difficult for courts to determine in any

8    particular case whether the licensor is permitting favorable, and suppressing

9    unfavorable, expression." *Lakewood*, 486 U.S. at 757–58. By expressly identifying

10   the element of the proposed plate upon which the rejection is based—and

11   suggesting concrete changes that CFF may make in order for the plate to be

12   approved—the Department has isolated the variable upon which its decision was

13   based. Once again, *Griffin* is on point and persuasive. There the court concluded

14   that any potential constitutional violation posed by the contested regulation was

15   more appropriately addressed through as-applied challenges in part "because

16   the *Lakewood* rationales for facial invalidation [were] weak in the context of this

17   challenge." 288 F.3d at 1327–28. Moreover, the threat of self-censorship here is

18   mitigated by a rejection process that permits reapplication, not to mention the

1    fact that individuals are still permitted to express their beliefs in other, very

2    similar means to which the State's program does not apply (e.g., bumper

3    stickers). *See Perry*, 280 F.3d at 169 ("Vermont's policy does not prevent Perry

4    from communicating any particular message on her automobile. For instance,

5    Perry may display a bumper sticker bearing the letters SHTHPNS if she so

6    desires.").

7         CFF's reliance on *Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009) is misplaced.

8    There, the Eighth Circuit found that a Missouri law vested unbridled discretion

9    in state officials where the law authorizing the "Joint Committee" to approve

10   plates only provided that "the committee shall approve [the plate] by unanimous

11   vote," without any further guidelines. *Id.* at 869–70. The Eight Circuit cautioned

12   that "'[a] law or policy permitting communication in a certain manner for some

13   but not for others raises the specter of content and viewpoint censorship.'" *Roach*,

14   560 F.3d at 869 (alteration omitted) (quoting *Lakewood*, 486 U.S. at 763). Because

15   the regulation at issue in *Roach* provided "no standards or guidelines whatsoever

16   to limit the unbridled discretion of the Joint Committee," and "[c]onsequently

17   the Joint Committee can deny an application for a specialty plate based solely on

18   the organization's viewpoint," *id.* at 869–70, the Eighth Circuit concluded that the

38

1    regulation ran afoul of the First Amendment. Here, by contrast, the regulation

2    itself and the DMV's well-established and consistently applied policy and

3    practice provide the guidelines that were lacking in *Roach*.

4         Relying on *Beal v. Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999), CFF argues

5    that the existence of the statute is insufficient because the standards set forth are

6    vague and thus do not adequately bridle the Commissioner's discretion.    We

7    disagree. Although the regulation prohibiting license plates that are "obscene,

8    lewd, lascivious, derogatory to a particular ethnic or other group, or patently

9    offensive" may require some parsing, these are words that judges, and members

10   of the legal profession in general, interpret and apply frequently. In *Perry*, for

11   example, this Court was able to determine that the word "shit" was "offensive."

12   Perry, 280 F.3d at 169. Again, in a nonpublic forum analysis, the fact that the

13   Commissioner may exercise some discretion is not fatal to the statutory scheme.

14   Thus, while the constraints on the Commissioner may be modest, they are

15   sufficient to bridle the Commissioner's discretion and thus to pass Constitutional

16   muster.

17        Finally, any suggestion that the custom plate regime is impermissible

18   because it is framed in terms of when the Commissioner *may not* exercise

39

1   discretion, as opposed to when the Commissioner *may* exercise that discretion,

2   *see* **Dissent at 12-13,** is unavailing. In *Perry*, we upheld Vermont's custom plate

3   regime, which included a regulation that limited discretion by prohibiting, not

4   permitting, certain content. *Perry*, 280 F.3d at 172 n.9 (citing VT. CODE R.

5   14-050-025). We see no reason why an administrator's discretion must be bridled

6   by mechanisms that provide a floor, rather than serve as a ceiling—particularly

7   so in the context of nonpublic forums, where the government administrator may

8   be afforded "greater latitude," *Griffin*, 288 F.3d at 1323. The closely related

9   argument on the permissive nature of the relevant statutory and regulatory

10  provision (*i.e.*, that the Commissioner "may" issue custom plates but is never

11  required to do so) similarly unavailing. *See Thomas*, 534 U.S. at 325 (concluding

12  that "[o]n balance . . . the permissive nature" of [a similar] ordinance framed

13  similarly to the relevant provisions in this case "furthers, rather than constricts,

14  free speech").

15      In sum, 15 N.Y.C.R.R. § 16.5(e), coupled with the Department's

16  well-established and consistently applied policy and practice, leads us to

17  conclude that objective criteria do indeed limit the exercise of the

18  Commissioner's discretion. CFF, having availed itself of the opportunity to

40

1    challenge facially the custom plate program under the unbridled discretion

2    doctrine, must "also bear the 'heavy burden' imposed on those seeking to

3    invalidate a law on its face," *Griffin*, 288 F.3d at 1328. *See also Finley*, 524 U.S. at

4    580; *Amidon*, 508 F.3d at 98. We conclude that CFF has failed to "'demonstrate a

5    substantial risk' that application of the challenged practice or provision will lead

6    to a First Amendment violation," *Amidon*, 508 F.3d at 98 (quoting *Finley*, 524 U.S.

7    at 580). We thus sustain the program on its face and turn to CFF's as-applied

8    challenge.

9                                **D. As-Applied Challenge**

10         In a nonpublic forum, the government enjoys great "latitude in restricting

11    speech," and "may limit access or content 'based on subject matter and speaker

12    identity so long as the distinctions drawn are reasonable in light of the purpose

13    served by the forum and are viewpoint neutral.'" *Byrne*, 623 F.3d at 54 (quoting

14    *Cornelius*, 473 U.S. at 806). Here, the district court held that the DMV's denial of

15    the "Choose Life" custom plate was both "viewpoint discriminat[ion]" and

16    "unreasonable." *Children First Found.*, 829 F. Supp. 2d at 59–63. We disagree with

17    both conclusions.

18

1      **1. Viewpoint Neutrality**

2      Two principles guide our evaluation of viewpoint neutrality within the

3      context of a nonpublic forum. "First, the government may permissibly restrict

4      content by prohibiting *any* speech on a given topic or subject matter," as long as

5      the restriction encompasses the entirety of the discrete subject. *Byrne*, 623 F.3d at

6      54–55 (emphasis in original); *see also Perry*, 280 F.3d at 170 ("[T]he government

7      may reasonably restrict expressive activity in a nonpublic forum on the basis of

8      content, but not on the basis of the speaker's viewpoint."). Second, if "the

9      government has permitted *some* comment on a particular subject matter or topic,

10     it may not then 'regulate speech in ways that favor some viewpoints or ideas at

11     the expense of others.'" *Byrne*, 623 F.3d at 55 (emphasis in original) (quoting

12     *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)).

13     Accordingly, the state must be careful to excise the entire matter from the forum,

14     or else it will violate the First Amendment by "den[ying] access to a speaker

15     solely to suppress the point of view he espouses on an otherwise includible

16     subject." *Cornelius v. NAACP Leg. Def. Fund*, 473 U.S. 788, 806 (1985).

17     Several of our sister circuits have grappled with the question of whether

18     excluding speech touching on the issue of abortion constitutes viewpoint

42

1    discrimination. The Fourth Circuit dealt with this issue in *Planned Parenthood of*

2    *South Carolina Inc. v. Rose*, 361 F.3d 786, 794–95 (4th Cir. 2004). There, South

3    Carolina authorized the issuance of a "Choose Life" plate but rejected a plate

4    espousing a pro-choice message. The Fourth Circuit concluded South Carolina

5    engaged in viewpoint discrimination:

6             In the license plate forum, South Carolina has
7             authorized the expression of only one position in the
8             abortion debate, thereby promoting the expression of
9             one viewpoint (pro-life) while preventing the
10            expression of the other viewpoint (pro-choice). By
11            granting access to the license plate forum only to those
12            who share its viewpoint, South Carolina has provided
13            pro-life supporters with an instrument for expressing
14            their position and has distorted the specialty license
15            plate forum in favor of one message, the pro-life
16            message. In short, as the district court correctly
17            determined, the Act was adopted because of the State's
18            agreement with the pro-life message. South Carolina
19            has therefore discriminated based on viewpoint.

20

21   *Id.* at 795 (citations omitted).

22            In *Choose Life Illinois*, the Seventh Circuit considered Illinois' refusal to

23   issue a "Choose Life" plate based on the State's explanation that it "has excluded

24   the *entire subject* of abortion from its specialty-plate program; it has authorized

25   neither a pro-life plate nor a pro-choice plate." 547 F.3d at 855 (emphasis in

43

1    original). The court concluded that exclusion was a permissible "content-based

2    but viewpoint-neutral restriction," reasoning that:

3            Illinois has not favored one viewpoint over another on
4            the subject of abortion or prohibited the display of a
5            viewpoint-specific symbol. Instead, the State has
6            restricted access to the specialty-plate forum on the
7            basis of the *content* of the proposed plate—saying, in
8            effect, "no abortion-related specialty plates, period."
9            This is a permissible content-based restriction on access
10           to the specialty-plate forum, not an impermissible act of
11           discrimination based on viewpoint.
12
13   *Id.* at 865 (citations omitted and emphasis in original). We cited *Choose Life Illinois*

14   with approval in *Byrne. See* 623 F.3d at 54–55.

15           Presented with a similar case in *Arizona Life Coalition Inc. v. Stanton*, 515

16   F.3d at 971–73 (9th Cir. 2008), the Ninth Circuit reached the opposite conclusion

17   from the Seventh Circuit's *Choose Life Illinois* decision. There, Arizona's License

18   Plate Commission rejected a "Choose Life" plate based on "concerns over

19   whether the general public would believe Arizona had endorsed the message of

20   Choose Life" and on "concerns over whether groups with differing viewpoints

21   would file applications. *Id.*at 961. The Ninth Circuit concluded this constituted

22   viewpoint discrimination rather than a permissible subject matter limitation,

23   relying heavily on the Supreme Court's decision in *Rosenberger v. Rector and*

44

1    *Visitors of University of Virginia*, 515 U.S. 819 (1995), while acknowledging that

2    "'[t]he line between an acceptable subject matter limitation and unconstitutional

3    viewpoint discrimination is not a bright one.'" *Stanton*, 515 F.3d at 972 (quoting

4    *Cogswell v. City of Seattle*, 347 F.3d 809, 815 (9th Cir. 2003)). In *Rosenberger*, the

5    Court grappled with the constitutionality of the University of Virginia's ban on

6    student activity funding being allocated to support "religious activity," which

7    was defined as any activity that "primarily promotes or manifests a particular

8    belie[f] in or about a deity or an ultimate reality." 515 U.S. at 825. Categorizing

9    the prohibition as discrimination "against an entire class of viewpoints," the

10   majority criticized the dissent's conclusion that no viewpoint discrimination was

11   afoot as reflecting the "insupportable assumption that all debate is bipolar and

12   that antireligious speech is the only response to religious speech." *Id.* at 831.

13       We agree with the Ninth Circuit that the line between content-based

14   prohibition and viewpoint-based discrimination can often be hazy. We are,

15   however, hesitant to extend *Rosenberger*'s holding too far beyond the realm of

16   religious speech, lest the category of impermissible viewpoint-based exclusions

17   erode—and possibly subsume—the category of content-based exclusions that

18   would be otherwise permissible in the context of nonpublic forums. The issue of

45

1    abortion is complex and multi-faceted, to be sure, but a comparison to religion in

2    this context is too attenuated for the rationale underlying the *Rosenberger* Court's

3    holding. The debate regarding abortion is more "bipolar" than that regarding

4    religion, and pro-life and pro-choice speech are much more easily characterized

5    as the predominant response to each other. *See id.* Unlike religion, a person's

6    stance on abortion does not provide "a specific premise, [ ] perspective, [or]

7    standpoint from which a variety of subjects may be discussed and considered,"

8    and unlike in *Rosenberger*, New York's custom plate regime does not target a

9    "prohibited perspective," but rather the general subject matter of abortion. *Id.* We

10   therefore join the Seventh Circuit, and depart from the Ninth Circuit, in

11   concluding that the Department's rejection of CFF's proposed custom license

12   plate is a permissible content-based restriction imposed in a nonpublic forum,

13   rather than "an impermissible act of discrimination based on viewpoint." *Choose*

14   *Life Ill.*, 547 F.3d at 865.

15          This conclusion is consistent with this Court's precedent in *Byrne*, where

16   we favorably cited *Choose Life Illinois,* noting that "the government may

17   permissibly restrict content by prohibiting *any* speech on a given topic or subject

18   matter." *Byrne*, 623 F.3d at 54–55 (citing, *inter alia, Choose Life Ill.*, 547 F.3d at 865

46

1    (the "state may properly exclude[ ] the *entire subject* of abortion from its

2    specialty-plate program" (emphasis in original and internal quotation marks

3    omitted))). Here, New York employed an approach similar to that of Illinois: as

4    the DMV explained, its "decision is not based on the content of the proposed

5    speech, but instead is intended to preserve viewpoint neutrality by insuring that

6    plates issued by the State do not present or support <u>either</u> side." App'x at 441

7    (emphasis in original).

8        Unlike South Carolina in *Rose*, New York opted not to open up a forum for

9    debate of the subject of abortion. *See also Sons of Confederate Veterans,* 288 F.3d at

10   622–23 (finding viewpoint discrimination where legislation specifically

11   prohibited one group's logo). Whereas South Carolina impermissibly limited the

12   forum to one viewpoint, *see Rose*, 361 F.3d at 793–98, New York did just the

13   opposite. Here, the DMV rejected both pro-choice ("RU486") and pro-life

14   ("Choose Life") license plates. The DMV cited the same policy when it denied a

15   "Choose Life" custom plate application in 1998 as it did when it later repeatedly

16   denied CFF's application, thus evincing a standard practice of excluding custom

17   plates pertaining to the subject of abortion for safety reasons.    The DMV's denial

18   of CFF's proposed "Choose Life" custom plate therefore constitutes the

47

1    application of a permissible subject-matter based restriction imposed in a

2    nonpublic forum and does not constitute viewpoint discrimination.

3                            **2.  Reasonableness**

4         The reasonableness of a restriction "turns on the 'purpose of the forum and

5    all the surrounding circumstances,' and to survive First Amendment scrutiny the

6    restriction 'need not be the most reasonable or the only reasonable limitation'

7    imaginable," it must only be reasonable. *Byrne*, 623 F.3d at 59 (citation omitted)

8    (quoting *Cornelius*, 473 U.S. at 808-09). As long as the rationale is "consistent with

9    a legitimate government interest," the restriction will not run afoul of the First

10   Amendment. *Id.* at 59-60.

11        The DMV asserts that its restriction in this case serves two interests: (1) to

12   limit the potential for violence on the State's roads (*i.e.*, road rage); and (2) to

13   avoid the perception that the State endorses one side of a contentious political

14   issue. Both interests are manifestly legitimate, and we discuss the reasonableness

15   of the DMV's actions to further each interest in turn.

16        Excluding a highly charged topic—one which in our nation's recent

17   history has driven people to violent behavior, including bombings and

18   murder—from an environment set aside for the use of countless multi-ton

48

1    vehicles traveling at high rates of speed where thousands of deaths occur each

2    year, is consistent with the government's interest in safety. CFF's contention that

3    "Choose Life" plates have been available for purchase in other states for twelve

4    years with no definitive proof of ill effects, does not render unreasonable New

5    York's decision. At the time CFF sought approval for the plates, the abortion

6    debate was particularly volatile, and the DMV was aware of violent protests and

7    bombings at abortion clinics. Given the "purpose of the forum and all the

8    surrounding circumstances," *Byrne*, 623 F.3d at 59 (internal quotation omitted),

9    and contrary to the dissent's implication, we see no reason why the DMV,

10   serving the legitimate interest of highway safety, must demonstrate that "Choose

11   Life" plates have already incited roadway violence.

12        Pointing to several other custom plates that were approved and that it

13   claims pertain to comparably controversial issues, CFF argues that the rejection

14   of its proposed plate was unreasonable because the Department was not

15   consistent in banning "controversial" expressions, which "unquestionably

16   allow[ed] for viewpoint discrimination." Appellee's Br. 18. That argument does

17   not hold water. As Deputy Commissioner Dunn testified, the subject of abortion:

1              [is] so incredibly divisive across the country, that [it] is

2              not similarly situated to an organization seeking a

3              "Union Yes" plate. . . . [F]or a government agency to

4              issue a "Union Yes" plate is not going to invoke the

5              violence or outrage that would be provoked if a

6              government agency were to issue . . . a license plate [on

7              this] highly divisive issue.

8

9    App'x at 1364. Although reasonable minds may differ when weighing and

10   comparing the controversial nature of the various political issues of our day, it is

11   undisputed that abortion is among the most hotly and passionately contested.

12   We cannot conclude that the DMV acted unreasonably when it decided that

13   abortion was unique among the issues that CFF claims to be "similarly situated."

14   App'x at 441.

15       We turn now to the State's interest in avoiding the perception that it

16   supports one side of a controversial subject (i.e., maintaining viewpoint

17   neutrality). In *Perry*, we held that Vermont had a legitimate interest in rejecting

18   plaintiff's request for a "SHTHPNS" vanity plate because the government was

19   attempting to avoid being associated with "offensive" words like "shit." *Perry*,

20   280 F.3d at 169 ("The state has a legitimate interest in not communicating the

21   message that it approves of the public display of offensive scatological terms on

22   state license plates."). As Commissioner Jackson stated when he rejected a plate

50

1    supporting restoration of the grey wolf in the Adirondacks, "[l]icense plates were

2    not meant to be bumper stickers for causes" with the government's imprimatur

3    attached. App'x at 1666. The DMV advised CFF that if the organization found a

4    way to display a message that "is both directly related to its own mission [i.e.,

5    adoption] and unrelated to the controversial issue[]" of abortion, it would

6    reconsider the application. App'x at 410. CFF declined to make the change from

7    "Choose Life" to "Choose Adoption" in all three of its applications. The DMV

8    acted reasonably in rejecting an application advocating one side of a

9    controversial topic that it did not want to be perceived as endorsing, while

10   providing CFF a reasonable alternative that would still communicate the

11   message CFF purports to advance.

12          Moreover, individuals retain the ability to speak on the topic of abortion

13   regardless of the DMV's denial. *See Perry*, 280 F.3d at 169–70. For example,

14   people may display a "Choose Life" bumper sticker—or even cover every

15   available square inch of their vehicle with such stickers. That message will

16   resonate just as loudly as if the vehicle displayed a "Choose Life" license plate. It

17   will merely do so without the perception of State endorsement.

1    In sum, we will not disturb the Department's decision to reject a "Choose

2  Life" custom plate, which was made pursuant to a subject matter-based, but

3  viewpoint neutral policy, to exclude the entire subject of abortion from the

4  nonpublic forum of State-issued license plates. The decision was consistent with

5  the State's legitimate interests in keeping its roadways safe and avoiding the

6  appearance of State endorsement. CFF's as-applied challenge fails.

7                    **II.    Due Process & Equal Protection Claims**

8    CFF also claims that New York's custom plate regime violated its

9  Fourteenth Amendment rights under the Equal Protection and Due Process

10  Clauses. The district court did not reach these arguments, which we now reject.

11  CFF claims that its Fourteenth Amendment rights were violated because the

12  DMV's decision to allow some groups to voice their opinions, while not

13  affording CFF the same opportunity, constitutes "invidious discrimination"

14  forbidden under the Equal Protection Clause. Appellee Br. 56–60. Likewise, it

15  claims that the exercise of the Commissioner's discretion amounted to

16  discriminatory exclusion under the Due Process Clause. These conclusory

17  statements do nothing to identify a constitutional harm. *See D'Elia v. N.Y., New*

18  *Haven & Hartford R.R.*, 338 F.2d 701, 702 (2d Cir. 1964). They simply amount to

1    the First Amendment arguments that we have rejected, reframed in terms of

2    equal protection and due process violations. CFF's claim "fares no better in [this]

3    garb." *Perry Educ. Ass'n*, 460 U.S. at 54. The First Amendment provides the

4    "explicit textual source of constitutional protection" here, rather than some

5    generalized constitutional theory of equal protection or substantive due process.

6    *Catletti ex rel. estate of Catletti v. Rampe*, 334 F.3d 225, 229 (2d Cir. 2003) (quoting

7    *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998)). The First Amendment is

8    thus the appropriate yardstick by which to measure the constitutionality of the

9    DMV's custom license plate program. *Accord Graham v. Connor*, 490 U.S. 386, 395

10    (1989) (stating that where the Fourth Amendment was the "explicit textual

11    source of constitutional protection," as opposed to a more generalized notion of

12    due process, that Amendment must guide the Court's analysis).

13    **CONCLUSION**

14           We conclude that New York's custom license plate program, either on its

15    face or as applied in this case, does not violate the First Amendment. We

16    therefore REVERSE the district court's judgment, and REMAND this case to that

17    court to enter judgment in favor of defendant-appellant.

1    The mandate in this case will be held pending the Supreme Court's

2    decision in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct.

3    752 (U.S. Dec 05, 2014). Should any party believe there is a need for the district

4    court to exercise jurisdiction prior to the Supreme Court's decision, it may file a

5    motion seeking issuance of the mandate in whole or in part. Although any

6    petition for rehearing should be filed in the normal course pursuant to Federal

7    Rule of Appellate Procedure Rule 40, this Court will not reconsider its opinion

8    until after the Supreme Court's decision in *Walker*. The parties will have until

9    fourteen days following the date the Supreme Court's decision is filed to file

10   supplemental petitions for rehearing in light of *Walker*.